# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 02-3584 & 02-4344

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

PEDRO L. CASTILLO and
FRANK RODRIGUEZ,

*Defendants-Appellants.*

_____

Appeals from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 01 CR 567—**James F. Holderman**, *Judge.*

_____

ARGUED MARCH 30, 2004—DECIDED MAY 3, 2005

_____

Before POSNER, RIPPLE and MANION, *Circuit Judges.*

RIPPLE, *Circuit Judge.* In October of 2001, a federal grand
jury returned an indictment charging Pedro Castillo, Frank
Rodriguez and Alfredo Barrera[1] with violations of various
federal narcotics and firearms statutes. Mr. Rodriguez
pleaded guilty to one count of conspiring to distribute more
than 50 grams of crack cocaine from May of 2001 to June 20,

_____

[1] Barrera pleaded guilty and has not appealed.

2001. *See* 21 U.S.C. § 846; 18 U.S.C. § 2. Mr. Castillo was tried by jury and found guilty of the same count as Mr. Rodriguez plus four additional counts, including one count of possessing a firearm in furtherance of a drug trafficking offense. *See* 18 U.S.C. § 924(c)(1)(A). On appeal, Mr. Castillo challenges his conviction. Mr. Castillo and Mr. Rodriguez challenge the portion of their respective written judgments ordering them to repay $3,000 in "buy money" as restitution. They also challenge their respective sentences. We held this case in abeyance pending the Supreme Court's decision in *United States v. Booker*, 125 S. Ct. 738 (2005). For the reasons set forth in this opinion, we now affirm Mr. Castillo's conviction. We reverse and remand the orders regarding repayment. In light of *Booker*, 125 S. Ct. 738, while retaining jurisdiction, we remand this case to the district court in accordance with our court's decision in *United States v. Paladino*, 401 F.3d 471, 2005 WL 435430 (7th Cir. Feb. 25, 2005).

# I

# BACKGROUND

## A. Facts

### 1. June 4, 2001 Transaction

In March or April of 2001, a confidential informant ("CI") contacted Mr. Rodriguez, who had been introduced to the CI as a drug supplier. The two met, and Mr. Rodriguez agreed to supply the CI with samples of illegal drugs. On June 4, 2001, the CI ran into Mr. Rodriguez at a restaurant; Mr. Rodriguez agreed to give the CI samples of powder cocaine and marijuana that night. The two met later, and their meeting was recorded by the Federal Bureau of

Investigation ("FBI"). At this meeting, Mr. Rodriguez gave the CI two small bags containing samples of cocaine and marijuana.

### 2.  June 7, 2001 Transaction

Subsequently, Mr. Rodriguez agreed to provide the CI with three ounces of crack cocaine in exchange for a payment of $3,000. Mr. Rodriguez arranged to obtain the three ounces of crack cocaine requested by the CI from Mr. Castillo. On June 7, 2001, the CI met Mr. Rodriguez, and the two drove to a basement apartment to obtain the crack. This transaction also was monitored and recorded by the FBI.

When they arrived and pulled into the garage adjacent to the basement apartment, Mr. Castillo was there. After introductions and small talk, Mr. Castillo told Mr. Rodriguez to search the CI. Mr. Castillo then "stood right by the work-bench[,] opened up a drawer" and pulled out three baggies containing "three ounces of powder form cocaine." Tr. at 131. Mr. Castillo informed the CI that he had been preoccupied and unable to cook the cocaine to make crack ahead of time, but he invited the CI to stay while he cooked it. Mr. Castillo, Mr. Rodriguez and the CI walked from the garage to the kitchen of the basement apartment. Over the next several hours, Mr. Castillo cooked the cocaine into crack, explaining the cooking process to the CI. Except for using the bathroom, which was a "short way down the hall-way," Tr. at 251, and maybe "going out to receive a phone call," Tr. at 149, the CI remained in the kitchen with Mr. Castillo. Mr. Rodriguez and Barrera were in and out of the kitchen during this time.

During the cooking, which was done in different batches, Mr. Castillo and the CI discussed the CI's buying more

crack cocaine from Mr. Castillo in the near future. Also during this time period, an unknown individual came to the door. The CI observed Mr. Castillo walk down the hallway, return with "[d]ime bags of cocaine" and hand them to the individual at the door. Tr. at 155. When Mr. Castillo returned to the kitchen to continue cooking, he told the CI: "Yeah, but you easy, you got three. The man that's coming though, he just bought six," apparently referring to ounces. Tr. at 165. Mr. Castillo also told the CI about other customers: "I got, I got four people waiting next to you. You know what I'm saying? So once I'm done with you, I gotta make a phone call. They'll come through . . . ." Tr. at 164-65. After Mr. Castillo was finished cooking, he gave the CI a total of approximately 72.3 grams of crack cocaine; the CI, in return, gave Castillo $3,000 in government funds, which Castillo put in the freezer.

### 3.  June 20, 2001 Transaction and Arrest

On June 18, 2001, the CI spoke to Mr. Castillo by phone. In this recorded conversation, Mr. Castillo agreed to provide the CI with seven ounces of crack cocaine in exchange for $7,000. The CI received $7,000 in government funds and a recording device. Then, on or about June 20, 2001, Mr. Castillo, Barrera and the CI met at a local restaurant. They discussed "the deal and future deals as well." Tr. at 184. Mr. Castillo then told the CI to come to his (Castillo's) car; Castillo got in the driver's seat, the CI got in the front passenger's seat and Barrera got in the back seat. Mr. Castillo pointed to a McDonald's bag, which the CI opened. The bag contained approximately 162.3 grams of crack cocaine. The CI told Mr. Castillo that the money for the crack was in his car, and, while the CI was getting out to go to his car, Castillo instructed the CI to follow him. After the CI, in his car, followed Mr. Castillo for some time,

Castillo waved for the CI to pull over, and they had a discussion regarding counting the money. At that point, the government agents converged, and Mr. Castillo and Barrera were arrested. The 162.3 grams of crack were recovered, and, as Barrera exited the car, agents observed and recovered a handgun near Barrera's feet.

### 4. June 20, 2001 Search of the Basement Apartment

Later that day, agents searched the basement apartment where the June 7, 2001 transaction had taken place. In the ceiling area of a rear storage closet off a bedroom down the hallway, agents recovered "3.8 grams of a mixture containing cocaine base, commonly known as crack," and "18.7 grams of mixtures containing cocaine" on a ceiling joist. Tr. at 315-16. The Government's drug trafficking expert testified that "3.8 grams would border either user or distribution quantity," Tr. at 417, and 18.7 grams of cocaine "would be in the neighborhood of a distribution quantity of cocaine," Tr. at 401. In that same storage area, approximately four to five feet from the drugs, the agents recovered a Mossburg shotgun with a sawed-off barrel. The shotgun had been modified to accommodate a pistol grip, and a pistol grip was recovered next to the shotgun. Agent Walker explained: "The pistol grip has been made to fit onto that gun. The bolt that you see coming out of the end of the shotgun does not appear to be adequate to secure that pistol grip on the shotgun." Tr. at 358. He further testified that he and some other agents "briefly looked at it, and it seemed like . . . you would need maybe a different type of bolt." Tr. at 359.

Also recovered near the shotgun was a white sock that contained four shotgun shells. Mr. Castillo's fingerprints were not recovered on the shotgun shells or the shotgun, but the Government's fingerprint expert testified that guns

and ammunition are not very receptive surfaces for leaving fingerprints. Tr. at 368. A drug trafficking expert explained that it was not unusual for somebody involved in drug trafficking to have an unloaded or loaded weapon "because drug traffickers commonly utilize firearms or weapons to protect their drugs and protect their drug proceeds, the amount of money that they have at their location where they're selling drugs from, from other drug traffickers or gang members who may want to rob them or break in and steal their drugs or drug money. So it's basically used as protection." Tr. at 415-16.

"Up towards the door area of this back closet area," the agents also recovered a box. Tr. at 291-92. This box contained a variety of drug paraphernalia, including weights and scales, razors, plastic baggies, a "type of cutting agent that would be used to put into drugs to make it greater in quantity," Tr. at 292, and a "drug ledger," Tr. at 412. The drug trafficking expert testified that these are tools of the drug trade. The agents also recovered from the apartment a number of pieces of mail, documents and photographs indicating that the apartment was in fact Mr. Castillo's home. For example, the address label on one piece of mail read: "Pedro Castillo, 3328 West 65th Place, house basement, Chicago, Illinois 60629." Tr. at 324.

## B. District Court Proceedings

In October of 2001, a grand jury charged Mr. Castillo and Mr. Rodriguez (and Barrera) with a number of violations of federal narcotics and firearms statutes. Specifically, Mr. Castillo and Mr. Rodriguez both were charged with conspiring to distribute more than 50 grams of crack cocaine from May 2001 to June 20, 2001 (Count I), *see* 21 U.S.C.

§ 846; 18 U.S.C. § 2, and distributing more than 50 grams of crack cocaine on June 7, 2001 (Count II), *see* 21 U.S.C. § 841(a)(1); 18 U.S.C. § 2.

Mr. Castillo also was charged individually with four more counts. Counts III and IV were based on the crack cocaine and the handgun recovered in Mr. Castillo's car during the June 20, 2001 transaction and arrest. These counts charged Mr. Castillo with possessing in excess of 50 grams of cocaine base with the intent to distribute, *see* 21 U.S.C. § 846; 18 U.S.C. § 2 (Count III), and carrying a firearm during and in relation to, and knowingly possessing a firearm in furtherance of, the drug trafficking offense set forth in Count III, *see* 18 U.S.C. § 924(c)(1)(A) & 924(c)(2) (Count IV). Counts V and VI were based on the cocaine base and cocaine mixture and the shotgun found in the basement apartment during the June 20, 2001 search. These counts charged him with possessing 3.8 grams of cocaine base and 18.7 grams of mixtures containing cocaine with the intent to distribute, *see* 21 U.S.C. § 841(a)(1) (Count V), and possessing a firearm in furtherance of the drug trafficking offense set forth in Count V, *see* 18 U.S.C. § 924(c)(1)(A) & 924(c)(1)(B)(i) (Count VI).

Mr. Rodriguez pleaded guilty to Count I. He was sentenced to 180 months in prison and five years of supervised release, and he was ordered to pay a $500 fine and a $100 special assessment. The district court also orally ordered Mr. Rodriguez to repay the $3,000 "buy money" as a condition of supervised release. However, the written judgment against Mr. Rodriguez asserted that the $3,000 repayment was restitution and not a condition of supervised release. On appeal, Mr. Rodriguez contends that the written judgment's characterization of the $3,000 repayment as restitution was incorrect. In this court, the Government concedes that this was a clerical error and that the $3,000 repayment appropriately is considered a condition of supervised release.

The same error of deeming the $3,000 repayment as restitution occurred in Mr. Castillo's sentencing. We agree with the defendants and the Government that a remand is appropriate as to both defendants to clarify that the $3,000 repayment is a condition of supervised release.

Mr. Castillo was convicted on Counts I, II, III, V and VI, but not Count IV. He was ordered to serve a concurrent sentence of 210 months for Counts I, II, III and V, and he was ordered to serve a consecutive sentence of 120 months for Count VI. He also was sentenced to five years of supervised release on each count of conviction and ordered to pay a fine of $3,000 and a special assessment of $500. Finally, as noted previously, he also was ordered to repay $3,000 buy money under the faulty label of restitution.

# II

# DISCUSSION

## A. Mr. Castillo's Conviction under § 924(c)(1)(A)

Mr. Castillo challenges his conviction under Count VI that charged him with "possess[ing]" a firearm "in furtherance of" the drug trafficking offense charged in Count V. The relevant portion of § 924(c)(1)(A) provides certain mandatory penalties for "any person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm." The Government's theory for Count VI was that Mr. Castillo "possess[ed]" the shotgun "in furtherance of" the crime of possessing, with the intent to distribute, 3.8 grams of cocaine base and 18.7 grams of cocaine mixtures on June 20, 2001, the date on which the agents searched the basement apartment and recovered these goods in the storage area. Mr. Castillo raises two objections to his

conviction under Count VI. First, he argues that the evidence was insufficient to establish that he "possess[ed]" the shotgun "in furtherance of" the underlying drug trafficking offense. Second, he argues that the jury instructions on this count were insufficient and caused him prejudice.

### 1. Sufficiency of the Evidence

By way of background, § 924(c)(1)(A)'s criminalizing "possess[ion]" of a gun "in furtherance of" certain crimes of violence and drug trafficking offenses was added by Congress in 1998 in response to the Supreme Court's decision in *Bailey v. United States*, 516 U.S. 137 (1995). *Bailey* concerned the prior version of the statute, which did not explicitly mention "possession" but criminalized "using" and "carrying" a firearm "during and in relation to" these crimes. In the specific case under consideration, the court of appeals had affirmed two convictions for "use" of a weapon "during and in relation to" a drug crime based on an "'accessibility and proximity' test," which held that "'one uses a gun, i.e., avails oneself of a gun, and therefore violates [§ 924(c)(1)], whenever one puts or keeps the gun in a particular place from which one (or one's agent) can gain access to it if and when needed to facilitate a drug crime.'" *Id.* at 141 (quoting *United States v. Bailey*, 36 F.3d 106, 115 (D.C. Cir. 1994) (en banc)). The Supreme Court rejected this broad interpretation of "use" and held that "use" required some type of "active employment." *Id.* at 144. The Court noted: "Had Congress intended possession alone to trigger liability under § 924(c)(1), it easily could have so provided." *Id.* at 143. In 1998, Congress accepted the invitation and broadened § 924(c) to sweep in the mere possession of weapons, but only when the weapons were possessed "in furtherance of" the underlying crime.

In this case, Mr. Castillo challenges the sufficiency of the evidence as to both the "possess[ion]" and "in furtherance of" elements of § 924(c)(1)(A). In adjudicating a sufficiency of the evidence challenge, this court "consider[s] the evidence in the light most favorable to the Government, defer[s] to the credibility determination of the jury, and overturn[s] a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Jackson*, 177 F.3d 628, 630 (7th Cir. 1999) (internal quotation marks and citation omitted).

### a. Possession

Possession for purposes of § 924(c) can be either "actual" or "constructive." *United States v. Rawlings*, 341 F.3d 657, 659 (7th Cir. 2003). "Constructive possession" is defined as "one's having (and knowing one has) 'the power and the intention at a given time to exercise dominion and control over the firearm, either directly or through others.'" *Id.* (citation omitted). If a person exercises *exclusive* control over a premises, then constructive possession of a weapon found therein can be inferred. *See, e.g., United States v. Wahl*, 290 F.3d 370, 376 (D.C. Cir. 2002). However, if the defendant jointly occupies the premises, the Government must present some evidence that supports a nexus between the weapon and the defendant. *See, e.g., United States v. Heckard*, 238 F.3d 1222, 1228 (10th Cir. 2001).

In this case, Mr. Castillo submits that there is "no evidence of exclusive ownership or possession of the apartment," Reply Br. at 1, but that contention is without merit. The Government introduced into evidence pieces of mail, documents and photographs that they recovered from the basement apartment that strongly support the conclusion

that the apartment was Mr. Castillo's. For example, as we noted above, the address label on one piece of mail read: "Pedro Castillo, 3328 West 65th Place, house basement, Chicago, Illinois 60629." Tr. at 324. Also, an "AT&T Cable Services" "work order," under a box marked "Service Name and Address," read: "Castillo[,] Pedro, 3328 West 65th Place, Chicago, Illinois 60629-3420." *Id.*

Furthermore, Mr. Castillo's actions and commentary on June 7, 2001—cooking crack cocaine in the kitchen, dealing drugs from the apartment, suggesting more people would be coming by the apartment to buy drugs from him—were consistent with the idea that he exercised dominion over the apartment. *See United States v. Finley*, 245 F.3d 199, 203 (2d Cir. 2001) ("Finley also argues that the evidence did not show that he had control of the house. However, a reasonable jury could also have found the requisite control based on the evidence that Finley was conducting a drug dealing business by himself from inside the house."); *see also United States v. Hishaw*, 235 F.3d 565, 571 (10th Cir. 2000) ("Circumstantial evidence may establish constructive possession."). There was little, if any, evidence that suggested that any other person rented the apartment or utilized the apartment as his or her abode. The jury was more than entitled to find Mr. Castillo's exclusive possession of the basement apartment and constructive possession of the shotgun.

### b. In Furtherance Of

Mr. Castillo next argues that the evidence was insufficient to establish that he possessed the shotgun "in furtherance of the underlying drug crime: the possession of, with the intent to distribute, cocaine base and a cocaine mixture on June 20, 2001.

This argument invites us for the first time to consider in detail the "in furtherance of" language in 18 U.S.C. § 924(c)(1)(A), which, as we noted above, was added by Congress in 1998 in response to the Supreme Court's decision in *Bailey*, 516 U.S. 137. Our task is made easier by the fact that our sister circuits have reviewed this language and have come to fundamentally the same conclusion. *See United States v. Sparrow*, 371 F.3d 851, 852-54 (3d Cir. 2004); *United States v. Hamilton*, 332 F.3d 1144, 1149 (8th Cir. 2003); *United States v. Luciano*, 329 F.3d 1, 6 (1st Cir. 2003); *United States v. Lomax*, 293 F.3d 701, 705 (4th Cir. 2002); *United States v. Wahl*, 290 F.3d 370, 376 (D.C. Cir. 2002); *United States v. Timmons*, 283 F.3d 1246, 1252-53 (11th Cir. 2002); *United States v. Basham*, 268 F.3d 1199, 1207-08 (10th Cir. 2001); *United States v. Mackey*, 265 F.3d 457, 462 (6th Cir. 2001); *United States v. Finley*, 245 F.3d 199, 203 (2d Cir. 2001); *United States v. Ceballos-Torres*, 218 F.3d 409, 412 (5th Cir.), *modified on denial of rehearing*, 226 F.3d 651 (5th Cir. 2000); *see also United States v. Krouse*, 370 F.3d 965, 967-68 (9th Cir. 2004) (agreeing with the core of the other circuits' analyses but questioning the utility of some of the "*Ceballos-Torres* factors"). After carefully studying these opinions and their rationales, we join the core of their analyses and add some further elaboration on the meaning of "in furtherance of" where relevant to this case.

As the circuits note, the natural meaning of "in furtherance of" is "furthering, advancing or helping forward." *See, e.g.*, *Hamilton*, 332 F.3d at 1149. The negative implication of this definition is that the mere presence of a weapon at the scene of a drug crime, *without more*, is insufficient to prove that the gun was possessed "in furtherance of" the drug crime. *See Mackey*, 265 F.3d at 462 ("[T]he possession of a firearm on the same premises as a drug transaction would not, without a showing of a connection between the two,

sustain a § 924(c) conviction."). Understanding "in further-ance of" in this manner fits not only the phrase's natural meaning, the starting point of all inquiries into statutory construction, but it also is supported by the statute's legi-slative history, and, more importantly, its purpose. *See Bailey*, 516 U.S. at 145 (beginning with the "ordinary and natural" meaning of "use" in § 924(c) and then moving on to "con-sider not only the bare meaning of the word but also its placement and purpose in the statutory scheme").

The report by the House Committee on the Judiciary that addressed the bill to amend § 924 explained "in furtherance of" in these terms:

> The government must clearly show that a firearm was possessed to advance or promote the commission of the underlying offense. The mere presence of a firearm in an area where a criminal act occurs is not a sufficient basis for imposing this particular mandatory sentence. Rather, the government must illustrate through specific facts, which tie the defendant to the firearm, that the firearm was possessed to advance or promote the crim-inal activity.

> The facts of the *Bailey* decision . . . provide a good example. The Committee believes that the evidence presented by the government in that case may not have been sufficient to sustain a conviction for possession of a firearm "in furtherance of" the commission of a drug trafficking offense. In that case, a prosecution expert tes-tified at Mr. Bailey's trial that drug dealers frequently carry a firearm to protect themselves, as well as their drugs and money. Standing on its own, this evidence may be insufficient to meet the "in furtherance of" test. The government would have to show that the firearm located in the trunk of the car advanced or promoted Mr. Bailey's drug dealing activity. The Committee be-

> lieves that one way to clearly satisfy the "in furtherance of" test would be additional witness testimony connecting Mr. Bailey more specifically with the firearm.

H.R. Rep. No. 105-344, 1997 WL 668339, at *11-12. The idea underlying this report—that § 924(c)(1)(A) was intended to reach weapons that actually facilitate crimes and not those innocently possessed in the vicinity—also accords with the very purpose of § 924(c). Quite simply, the portion of § 924(c) upon which we focus was intended to "combat the dangerous combination of drugs and guns." *Muscarello v. United States*, 524 U.S. 125, 132 (1998) (internal quotation marks and citation omitted). If the gun at issue did not advance or further the underlying drug crime, the critical drug/gun nexus is lacking, and the very purpose of the statute is not implicated; if the gun at issue did advance the drug crime, the very purpose of the statute, as well as its language and legislative history, suggests that the gun was intended to be within § 924(c)(1)(A)'s ambit.

In a case such as the one before us, when the charge is possession with the intent to distribute narcotics, a gun which is possessed (but not held, pulled, brandished or fired) plausibly could advance the possession and future distribution of narcotics in a variety of ways. In this context, the weapon can protect or be available to protect the possession and future distribution of the drugs or the drug dealer. The presence of a weapon serves as a potent warning to those who might contemplate stealing the drugs and a potent tool to defend against those who actually undertake to steal the contraband. *See United States v. Gaston*, 357 F.3d 77, 83 (D.C. Cir. 2004) (finding weapons possessed "in furtherance of" when they were "strategically located so that [they were] quickly and easily available for use" (internal quotations marks and citations omitted)). The presence of the firearm is a stark signal to other drug dealers that this turf is taken.

*See Ceballos-Torres*, 218 F.3d at 412. No doubt, as in this case, these valid "in furtherance of" theories often will be outlined by a drug-trafficking expert who will testify broadly about how drug dealers *generally* use weapons as "tools of the trade" in these various ways. The Government, however, cannot stop there; for a § 924(c)(1)(A) conviction based on possession to have merit, the evidence must establish a *specific* nexus between the *particular* weapon and the *particular* drug crime at issue. Put slightly differently, the Government must offer evidence to validate the notion that the specific weapon at issue in fact furthered the drug crime by, for example, being available for the protection of the drug dealer or his drugs. *See id.* at 414. That specific factual nexus is essential to distinguish between a gun on the premises which has no reasonable relationship to the drug possession and future distribution and a weapon that is present to further that possession.

Often, the evidence regarding the underlying drug crime and the weapon will be so intertwined that establishing the link will be easy, at least at the sufficiency of the evidence stage. *See Lomax*, 293 F.3d at 706 ("[A] fact finder is certainly entitled to come to the common-sense conclusion that when someone has both drugs and a firearm on their person, the gun is present to further drug trafficking."). Other cases will be more difficult. For example, if police search a house and uncover drugs and a "wall-mounted antique" or "an unloaded hunting rifle locked in a cupboard," *Mackey*, 265 F.3d at 462, the necessary link between the possession and intent to distribute the drugs and the antique or hunting rifle would be much more difficult to establish.

In short, "in furtherance of" means what it says: The Government must present a viable theory as to how the gun furthered the drug possession or distribution (e.g., being

available to protect the drugs or drug dealer), and it must present specific, non-theoretical evidence to tie that gun and the drug crime together under that theory. The Fifth Circuit has developed a non-exclusive list of factors to help in determining whether a gun was, in fact, possessed "in furtherance of" the drug crime: "the type of drug activity that is being conducted, accessibility of the firearm, the type of the weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun is found." *Ceballos-Torres*, 218 F.3d at 414-15. These factors are useful, but, given the fact-intensive nature of the "in furtherance of" inquiry, the weight, if any, these and other factors should be accorded necessarily will vary from case to case.

Returning to the case before us, the Government submitted that Mr. Castillo possessed the shotgun "in furtherance of" his possession and intent to distribute the cocaine base and cocaine mixture on June 20, 2001. The Government succinctly explained in its brief to this court its "in furtherance of" theories and supporting evidence:

> [Castillo] strategically placed the shotgun near his cache of drugs in the ceiling storage space, for the purpose of protecting himself, his drugs, and his ongoing drug trafficking business. The proximity of the shotgun to Castillo's cache of drugs afforded Castillo the opportunity to conceal the gun, while at the same time making it readily accessible anytime Castillo was retrieving drugs from his cache. The June 7, 2001, transaction witnessed by the CI demonstrates that Castillo's practice was to retrieve drugs from the cache whenever a customer came to pick up drugs. Keeping the gun and the drugs in the same area also ensured that anyone poking around Castillo's apartment might think twice

> about taking his stash of drugs, knowing he was armed, ready and able to protect them from theft. Based on this evidence, the jury was entitled to draw the reasonable inferences that Castillo possessed the short-barrel shotgun for the purpose of protecting himself, his drugs, and his business.

Appellee's Br. at 13-14. As we explained above, these "in furtherance of" theories are consistent with the statutory scheme. Moreover, the evidence propounded in support of them was ample.

Mr. Castillo's theory of the case is that the shotgun was "merely present" at the apartment and did not further the underlying drug trafficking offense. However, his argument, and many of the "facts" he cites in support of his argument, arise from a misconception of the underlying offense. He consistently argues that there is no evidence that any drug *transaction* took place at the basement apartment on June 20, 2001—the date on which the drugs and shotgun at issue were recovered—and that there is no evidence that a drug *transaction* took place in the bedroom where the storeroom that contained the drugs and shotgun was located. From this faulty premise, Mr. Castillo argues that the shotgun was not in "proximity to . . . drugs or profit" involved in any *transactions* that took place at the apartment and that he (Mr. Castillo) did not have "access[ ] to the firearm" during any drug *transaction*. Appellant's Br. at 24-25 (referring to *Ceballos-Torres*, 218 F.3d at 415 (explaining proximity and accessibility as two factors)). However, the underlying of-fense in this case is *possession* of, with the *intent* to distribute, the narcotics discovered on June 20, 2001, in the storage area. *See* 21 U.S.C. § 841(a)(1) (stating that it is "unlawful for any person knowingly or intentionally" to "*possess* . . . with *intent* to . . . distribute" certain types of narcotics (emphasis added)). Thus, the question in this case is whether the

shotgun helped further the possession and future distri-
bution of those drugs on June 20, 2001; it is not whether the
shotgun helped to further or facilitate some specific *transac-
tion*, such as the June 7, 2001 sale of crack from Mr. Castillo
to the CI in Castillo's basement apartment.[2]

The other "facts" or evidence Mr. Castillo cites that are not
based on this faulty premise include: (1) Mr. Castillo's
fingerprints were not found on the gun and no evidence
"conclusively" linked Mr. Castillo to the gun (although, as
noted *supra*, there was plenty of evidence to establish that
the gun was Mr. Castillo's); (2) there was no evidence the
gun was stolen or that it was illegally possessed by
Mr. Castillo, *see Ceballos-Torres*, 218 F.3d at 415 (noting these
as two factors); (3) the gun was not loaded when found

---

[2] Of course, the dealings in the basement apartment on June 7,
2001, certainly were relevant evidence that supported the
Government's theory under Count VI. For example, the prior
transactions (along with the taped conversations and the drug-
dealing equipment found at his apartment) helped to establish
Mr. Castillo was a drug trafficker with an ongoing business. This,
in turn, laid the foundation for the Government's expert to testify
that drug dealers keep guns near drugs to help protect them-
selves and their drugs. Also, Mr. Castillo's actions and ad-
missions during the June 7, 2001 transaction at his apartment
provided evidence from which the jury could conclude that he
sold drugs out of his apartment and that his modus operandi was
to retrieve the drugs from the storage area where the drugs (and
shotgun) were located and deliver them to patrons who came to
the door. For these reasons, and the reasons stated in the text, Mr.
Castillo simply has confused the importance of the June 7, 2001
transaction for purposes of Count VI when he suggests that the
June 7, 2001 events were irrelevant to Count VI because the
Government did not charge Mr. Castillo with possession of the
shotgun "in furtherance of" the June 7, 2001 transaction. *See*
Reply Br. at 1.

(although ammunition was found in a sock next to the shotgun), *see id.* (noting "whether the gun is loaded" is a factor); and (4) the gun was not "operable."[3] These and the other facts Mr. Castillo notes make some headway into the

---

[3] The actual testimony was that there was some question as to whether the pistol grip found next to the shotgun would fit on the gun with the existing bolt. *See* Tr. at 358-59 (testimony of Agent Walker) ("The pistol grip has been made to fit onto that gun. The bolt that you see coming out of the end of the shotgun does not appear to be adequate to secure the pistol grip on that shotgun . . . . We briefly looked at it, and it seemed like . . . you would need maybe a different type of bolt."). There was no evidence, however, that the shotgun needed the pistol grip to fire, i.e., to be "operable." Indeed, at the sentencing hearing, a firearms expert testified and demonstrated that the gun could fire even without the pistol grip being attached, and it would be "uncomfortable" but not cause "substantial harm." Sent. Tr. at 10-11. Given that, at this stage, we are required to "consider the evidence in the light most favorable to the Government," we cannot conclude that the evidence established that the gun was inoperable. *United States v. Jackson*, 177 F.3d 628, 630 (7th Cir. 1999) (internal quotation marks and citation omitted).

Even assuming the jury was required to conclude that the gun was in fact inoperable, it would not change our holding. There is no prerequisite that the gun be operable to be a "firearm" under 18 U.S.C. § 924(c). *See United States v. Buggs*, 904 F.2d 1070, 1075 (7th Cir. 1990) ("We cannot accept [the] claim that the government is required to prove that the gun was operable."). Moreover, even possessed weapons that do not fire can be used to advance the possession and future distribution of drugs. A reasonable jury could conclude on this record, for example, that someone threatening Mr. Castillo or his drugs would be deterred by a sawed-off shotgun pointed at him or even perched next to the drugs, even if that person was not completely sure if the gun was able to be fired.

Government's theory and counter some of the Government's evidence, but they are far from enough to overturn a jury's verdict. Based on the evidence, the jury could have concluded that Mr. Castillo was a drug dealer, he sold drugs out of his basement apartment by retrieving them from the back storage area where the narcotics and shotgun (and drug paraphernalia) were recovered in close proximity, and that the shotgun was possessed to further the possession and future distribution of those narcotics by being available to protect Mr. Castillo, his drugs and his drug trafficking business. *See Jackson*, 177 F.3d at 630 (explaining that, in adjudicating a sufficiency of the evidence challenge, the appellate court must "consider the evidence in the light most favorable to the Government, defer to the credibility determination of the jury, and overturn a verdict only when the record contains no evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt" (internal quotation marks and citation omitted)).

Our conclusion in this regard is supported by a number of cases. For example, in *Ceballos-Torres*, 218 F.3d 409, immigration agents, after being invited into Ceballos-Torres' home, "noticed a 9mm Glock handgun lying in plain view on top of the bed" in his bedroom. *Id.* at 411. Later, after obtaining a search warrant, the agents uncovered in closets cocaine, money with traces of cocaine and other drug paraphernalia. *Id.* Like Mr. Castillo, Ceballos-Torres was charged with possession with intent to distribute the cocaine discovered during the search, *see* 21 U.S.C. § 841, and knowing possession of a firearm in furtherance of that drug trafficking offense, *see* 18 U.S.C. § 924(c)(1)(A). The only issue before the Fifth Circuit on appeal was whether the Government had presented sufficient evidence to convict him of possession of the 9mm "in furtherance of" the drug trafficking

offense.

The Fifth Circuit did not look for a connection between the gun and any prior drug transaction, as Mr. Castillo suggests that we do. Instead, it concluded, with relative ease, that the evidence was sufficient to prove the handgun found on the bed furthered the possession and future distribution of the cocaine. *See Ceballos-Torres*, 218 F.3d at 415. The court explained:

> The weapon was loaded and easily accessible in Ceballos's apartment, and he confessed to ownership of the firearm. It was possessed illegally. And it was possessed in the apartment along with a substantial amount of drugs and money. Together, these factors reasonably support a finding that Ceballos's gun protected his drugs and money against robbery.

*Id.*

Similarly, in *United States v. Luciano*, 329 F.3d 1 (1st Cir. 2003), the police arrested Luciano near his apartment when he handed a parcel of heroin to a CI. The police then went to his apartment and recovered more heroin and two handguns in a crawlspace in the ceiling. *Id.* at 3-4. Luciano was indicted for possession with intent to distribute over 100 grams of heroin, *see* 21 U.S.C. § 841(a)(1) & (b)(1)(B), and possession of a firearm in furtherance of a drug trafficking crime, *see* 18 U.S.C. § 924(c)(1)(A). The First Circuit held that the evidence was more than sufficient to establish that these handguns were "possessed" "in furtherance of" the possession and future distribution of *both* the heroin in the parcel *and* the heroin found in the crawlspace:

> The government offered uncontradicted testimony that the heroin in the crawlspace had a retail street value of over $200,000, and that firearms are often used by drug dealers to protect drug stockpiles, to preempt encroach-

ment into a dealer's "territory" by rival dealers, and for retaliation. Presented with this evidence, the jury found that Luciano had possessed a firearm in furtherance of a drug trafficking crime. Given the close proximity of the firearms and loaded magazines to the significant stockpile of heroin, we have no difficultly concluding that there was a sufficient nexus between the drug trafficking crime and the firearms to sustain a conviction under § 924.

*Luciano*, 329 F.3d at 6.

In *United States v. Timmons*, 283 F.3d 1246 (11th Cir. 2002), undercover agents conducted a controlled buy of a weapon and 2.3 grams of crack cocaine in 1998 "in the quad area of Lakewood Apartments." *Id.* at 1249. Then, in late 1999, the agents obtained a warrant to arrest Timmons and search his apartment:

In the living room was a stove top oven. On top of the oven were two fully loaded firearms, an Intratec Model A B10 9mm luger and a Lorcin model 380. Inside the oven was an empty ammunition box of 9mm cartridges. In a closet next to the living room, agents found a bullet-proof vest. In addition, agents found crack cocaine and $350 inside a drawer under the stove. A clear plastic baggy with individual hits of crack cocaine was found under the cushions of the couch. Six individually packaged rocks of crack cocaine were recovered from a shoe of Timmons' size located in the bedroom of the apartment. In total, agents found 35.67 grams of crack cocaine in Timmons' apartment.

*Id.* at 1249. Timmons pleaded guilty to possessing the drugs with the intent to distribute them but contested the sufficiency of the evidence as to whether the one of the firearms found on the stove furthered or advanced the possession

and future distribution of the narcotics found in the apartment. *Id.* The court concluded:

> [A]fter considering the evidence in light of the relevant factors, we find that the evidence against Timmons (bullet proof vest, crack cocaine on the stove and under the cushions of the couch, two fully loaded firearms on top of the oven and ammunition inside the oven in the living room of his apartment) was sufficient for the jury to have concluded that Timmons was guilty of possessing the firearms "in furtherance of" drug trafficking.

*Id.* at 1253.

As the parties note in their briefs, some facts from these cases make them easier "in furtherance of" cases and some make them more difficult. The point, however, is that when faced with identical charges, identical "in furtherance of" theories and analogous facts, these courts concluded with relative ease that the evidence was sufficient to sustain the jury's verdict. We agree and hold that the jury's verdict in this case, as it relates to the "in furtherance of" element, is within the sufficiency of the evidence purview.

### 2. Jury Instructions

The jury instructions on Count VI stated, in relevant part, that the Government must prove "[f]irst, that the defendant committed the crime of possession with intent to distribute a controlled substance as charged in Count 5 [and] second, that the defendant knowingly possessed the firearm in furtherance of the crime." Tr. at 545. Mr. Castillo claims that the Count VI instructions were insufficient for three reasons: (1) they did not define "in furtherance of"; (2) they did not include an admonition that the "mere presence of a firearm alone is insufficient to find possession," Appellant's Br. at 29; and (3) the instructions did not include the factors set out in

*Ceballos-Torres*, which help distinguish when a gun is actually possessed "in furtherance of" the drug crime, as opposed to being "merely present" at the crime scene. Mr. Castillo's attorney did not object to the jury instructions on Count VI, nor did he offer an alternative to the Count VI instructions.[4] Therefore, we must review the instructions for plain error. *See* Fed. R. Crim. P. 52(b); *United States v. Trennell*, 290 F.3d 881, 886 (7th Cir. 2002). The Supreme Court has explained that a plain error occurs when there is (1) an error, (2) which is plain, (3) which affects the defendant's substantial rights, and (4) the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 732-35 (1993). In this case, we are unable to hold that the instructions for Count VI amount to plain error.

First, Mr. Castillo's argument that no definition of "in furtherance of" was given in the jury instructions is only half true. It is true that the instructions for Count VI did not

---

[4] Mr. Castillo argues that, at the charge conference, he adequately preserved his objection to the issues he now raises with regard to the instructions on Count VI. However, the transcript from the charge conference only contains an objection by Mr. Castillo's counsel to the instructions for Count IV. Count IV was also an 18 U.S.C. § 924(c)(1)(A) count, but it related to a different weapon, the one found in the car that Mr. Castillo emerged from on June 20, 2001, right before he was arrested. Furthermore, the objections made at the charge conference are quite far from his current contentions regarding the "in furtherance of" element in the instructions. *See* Tr. at 451; *see also United States v. Trennell*, 290 F.3d 881, 886 (7th Cir. 2002) ("To assign error to any portion of the charge to the jury or omission therefrom a party must state 'distinctly the matter to which that party objects and the grounds of the objection' before the jury retires to consider its verdict." (quoting Fed. R. Crim. P. 30)).

define "in furtherance of." *See* Tr. at 545. However, just one page earlier in the transcript, the judge explained as to Count IV, another § 924(c)(1)(A) count, that "[p]ossession of a firearm is in furtherance of a drug-trafficking crime if the possession furthers, advances, or helps forward the drug activity that is being conducted." Tr. at 544. The omission of the definition of "in furtherance of" the second time around as to Count VI is not even an error according to some courts. *See United States v. Contreras*, 950 F.2d 232, 240 (5th Cir. 1991) ("Contreras also contends that the district court should have defined the term 'willfully' in its attempt instruction. The district court did so in its instruction on count two. Once the court properly gave the instruction with regard to count two, it did not need to repeat that instruction on count five."). This approach makes sense of the rule that jury instructions should be reviewed as a whole and not in artificially subdivided pieces. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991). It is also hard to believe, as a practical matter, that the jury somehow forgot that definition when the judge read the instructions for Count VI a minute or so later or when they got to the jury room with the instructions.

Furthermore, the Count VI instructions were not given in a vacuum. The Government defined the proper meaning of "in furtherance of" in its closing argument:

> So how did that shotgun further a drug crime? That's the question. Did it further—simply did it help the drug crime? Did it aid a drug crime in some way? How did that shotgun help this defendant possess with intent to distribute narcotics?

Tr. at 475. Also in closing arguments, both the Government and defense emphasized § 924(c)(1)(A)'s critical nexus between the particular gun at issue and the drug trafficking offense; a nexus that, as discussed above, serves to eliminate

the possibility of a conviction for innocent possession of a gun, such as when a gun is *merely* present at a crime scene. *See* Tr. at 498 (defense closing) ("The law on finding weapons in a house deals with how close they were to each other, what the proximity to each other was. It deals with the relationship that that particular weapon had to the drugs."); Tr. at 528-29 (government rebuttal at closing) ("And this is not a gun you just keep around the house. It's not a hunting rifle. This is a sawed-off shotgun. And it's kept four to five feet away from where you keep your stash of drugs hidden in the ceiling area."); Tr. at 529 ("Drug dealing is going on in that house. That's where he's cooking his crack. People are coming to the front door. You want something there. It's [the shotgun] furthering his business. Because it gives him the sense of security he needs to keep doing business.").[5] These admonitions, which were given close in time to the jury instructions, substantially mitigate any danger flowing from the lack of elaboration in the Count VI instructions. *See United States v. Santos*, 932 F.2d 244, 252 (3d Cir. 1991) (holding that the "possibility of a mistaken understanding of the phrase [preponderance of the evidence] on the part of the jury" is "too remote to constitute plain error" when

---

[5] Indeed, some of the language used in the closing arguments reflects that used by courts in distinguishing between a gun possessed "in furtherance of" a drug trafficking offense and guns innocently possessed. *See, e.g., United States v. Finley*, 245 F.3d 199, 203 (2d Cir. 2001) ("[T]he requirement in § 924(c)(1) that the gun be possessed in furtherance of a drug crime may be satisfied by a showing of some nexus between the firearm and the drug selling operation."); *United States v. Mackey*, 265 F.3d 457, 462 (6th Cir. 2001) (noting that the factors employed by the circuits are intended to "distinguish possession in furtherance of a crime from innocent possession of a wall-mounted antique or an unloaded hunting rifle locked in a cupboard").

counsel "gave the jury an accurate explanation of the legal meaning of the phrase [in his closing argument], and that meaning is consistent with the common understanding of the words in the phrase").

Finally, an instructive line of cases holds that it is not error—plain or otherwise—to fail to give a definition of a statutory term or phrase that carries its natural meaning and that meaning is accessible to lay jurors. *See id.*; *United States v. Sherwood*, 770 F.2d 650, 654 (7th Cir. 1985) ("In view of the ordinary meaning the term 'willfully' has under section 3150 we do not think it likely that the failure to define the term confused the jury."). For example, a number of cases have held that failure to define "carries" in § 924(c)(1)(A) is not error because it is a commonly understood term. *See, e.g.*, *United States v. Rhodenizer*, 106 F.3d 222, 225 (8th Cir. 1997); *United States v. Freisinger*, 937 F.2d 383, 387 (8th Cir. 1991), *overruled on other grounds as stated in United States v. Beaman*, 361 F.3d 1061, 1064 (8th Cir. 2004) ("Even reviewing this issue under the plain error standard, there was simply no error in the district court's failure to give an instruction on the meaning of 'carries.'").[6] Similarly, as we discussed in

---

[6] The courts have held that the following terms do not connote such technical or unfamiliar meaning, and failure to define them in jury instructions does not constitute plain error. *See United States v. Blasini-Lluberas*, 169 F.3d 57, 67 (1st Cir. 1999) (failure to define "materiality" not plain error); *United States v. Fulmer*, 108 F.3d 1486, 1495 (1st Cir. 1997) (failure to define "intimidate" not plain error); *United States v. Garza-Juarez*, 992 F.2d 896, 910 (9th Cir. 1993) (failure to define "possession" not plain error); *United States v. Chambers*, 918 F.2d 1455, 1460 (9th Cir. 1990) (failure to define "knowingly" not plain error). *Cf. Miller v. Neathery*, 52 F.3d 634, 638-39 (7th Cir. 1995) (failure to define "recklessly"

(continued...)

detail above, "in furtherance of" naturally and necessarily connotes more than *mere* presence or innocent possession; as its natural meaning suggests (and as the instructions on Count IV and the parties in their closing arguments explained), it requires that the gun be possessed to further, advance or help forward the drug crime.

Given these factors, although it certainly would have been helpful to explain "in furtherance of" specifically with respect to Count VI, it is a stretch to deem that omission an error which is "plain" under Rule 52(b). *See United States v. Sumner*, 265 F.3d 532, 539 (7th Cir. 2001) (" 'Plain' in this context is synonymous with clear or obvious. At a minimum, this means the error must be clear under current law."). Even if it were a plain error, we cannot hold that Mr. Castillo has carried his burden of proving an effect on his "substantial rights," i.e., that the error affected the outcome of the district court proceedings. *See Olano*, 507 U.S. at 734; *United States v. Westmoreland*, 240 F.3d 618, 634 (7th Cir. 2001). Nor are we able to conclude this alleged error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Kibler*, 279 F.3d 511, 514 (7th Cir. 2002) ("If the defendants can [show the first three elements are met], the court of appeals has the discretion to correct the forfeited error under Rule 52(b), but 'the court should not exercise that discretion unless the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." ' " (quoting *Olano*, 507 U.S. at 732)). This is especially true given the overwhelming nature of the evidence establishing that the shotgun was possessed "in

---

[6] (...continued)
in the instructions was error (not necessarily plain error) because it is an enigmatic term that lawyers and lay persons have difficulty describing).

furtherance of" the underlying drug trafficking crime in this case. *See United States v. Mansoori*, 304 F.3d 635, 658 (7th Cir. 2002) (finding the error did not affect the fairness, integrity, or public reputation of judicial proceedings because, "[h]aving reviewed the record, we are convinced that upon a properly worded indictment, a properly instructed jury would have found the defendants guilty of distributing the requisite threshold quantities of narcotics"); *Westmoreland*, 240 F.3d at 635 ("We will find that an error [seriously affects the fairness, integrity, or public reputation] of judicial proceedings when an issue is closely contested and supported by conflicting evidence.").

"It is well-established that the plain error standard allows appellate courts to correct only particularly egregious errors for the purpose of preventing a miscarriage of justice." *United States v. Conley*, 291 F.3d 464, 470 (7th Cir. 2002). Because this is not such a case, we must reject Mr. Castillo's contention that the instructions on Count VI amounted to plain error warranting a new trial.

## C. Sentencing Errors[7]

Mr. Castillo and Mr. Rodriguez each argue that his respective sentence violated the Sixth Amendment as interpreted in *United States v. Booker*, 125 S. Ct. 738 (2005). Because neither defendant raised any challenge invoking the Sixth Amendment before the district court, we review for plain error. *See United States v. Paladino*, 401 F.3d 471,

---

[7] This opinion was circulated to the entire court with respect to the application of *United States v. Booker*, 125 S. Ct. 738 (2005), to Mr. Castillo's and Mr. Rodriguez's sentence. All but one member of the court in regular active service voted not to hear this case en banc. Judge Easterbrook voted to hear it en banc.

2005 WL 435430, at *7 (7th Cir. Feb. 25, 2005).

Under the plain error test, "before an appellate court can correct an error not raised at trial, there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.' " *United States v. Cotton*, 535 U.S. 625, 631 (2002) (quoting *Johnson v. United States*, 520 U.S. 461, 466-67 (1997)). " 'If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.' " *Id.* (quoting *Johnson*, 520 U.S. at 467).

### 1. Mr. Rodriguez's Sentence

Under the United States Sentencing Guidelines, the base offense level assigned to Mr. Rodriguez's offense was 32. *See* U.S.S.G. § 2D1.1(a)(3) & (c)(4) (at least 50 grams but less than 150 grams of cocaine base). In his plea agreement, Mr. Rodriguez waived his right to a jury trial, and he admitted, in the factual resume supporting his plea, that the offense involved about 72.3 grams of crack cocaine. He further agreed that the total amount of cocaine base attributable to him, for purposes of sentencing, was between 50 and 150 grams.

The pre-sentence report ("PSR") recommended a 2-level enhancement to Mr. Rodriguez's offense level for obstruction of justice based on a threatening letter that Mr. Rodriguez had written and sent that was intended to reach a potential witness in his case. A copy of the letter was attached to the PSR. In his plea agreement, Mr. Rodriguez agreed:

> The government's evidence would show that on about April 10, 2002, the defendant wrote and sent a letter from the Stephenson County Jail addressed to Individual B,

> that contained information that was intended to be given to Witness A in this case. Witness A had introduced the defendant to the CI in this case. In the letter, the defendant asked Witness A to visit him at the Stephenson County Jail. In the letter, the defendant said that if Witness A did not contact him by a certain date, "i will call my 3 brothers and my 6 cousins from their it will get very ugly once they find out im going to prison i cant control unless [Witness A] helps me. believe me its no joke these guy don't play and theirs nothing you or the FBI, or cops, or even god can do about it."

R.68 at 4. Mr. Rodriguez confirmed the accuracy of that statement at his plea colloquy. The district court accordingly imposed the obstruction enhancement. A final adjusted offense level of 34, combined with a criminal history category of II, resulted in a sentencing range of 168 to 210 months. The district court sentenced Mr. Rodriguez to 180 months in prison and three years of supervised release.

With respect to the first and second prongs of our plain error analysis, because Mr. Rodriguez's sentence relies solely upon facts admitted by him, the Sixth Amendment was not violated. *See Booker*, 125 S. Ct. at 756 ("[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt"). However, as our court has determined, the "mere mandatory application of the Guidelines—the district court's belief that it was required to impose a Guidelines sentence—constitutes error." *United States v. White*, No. 03-2875, slip op. at 14 (7th Cir. May 3, 2005) (citing in part *Booker*, 125 S. Ct. at 769 (remanding respondent Fanfan's sentence to allow parties to seek resentencing in light of *Booker* even though Fanfan's sentence did not violate the Sixth Amendment), and *Paladino*, 401 F.3d 471, 2005 WL 435430, at *7 (finding

*Booker* error where part of defendant Vellef's sentence "was based on mandatory provisions of the sentencing guide-lines")); *United States v. Schlifer*, 2005 WL 774914, at *3 (7th Cir. Apr. 8, 2005).[8]

---

[8] The other courts of appeals to have addressed this issue have reached the same conclusion. *See*, *e.g.*, *United States v. Valenzuela-Quevedo*, No. 03-41754, 2005 WL 941353, at *4 (5th Cir. Apr. 25, 2005) (stating that after *Booker* the mandatory application of the guidelines is error that satisfies the first two prongs of plain error); *United States v. Gonzalez-Huerta*, 403 F.3d 727, 2005 WL 807008, at *2 (10th Cir. Apr. 8, 2005) (en banc) ("a sentencing court could err by applying the Guidelines in a mandatory fashion, as opposed to a discretionary fashion, even though the resulting sentence was calculated solely upon facts that were admitted by the defendant, found by the jury, or based upon the fact of a prior conviction"); *United States v. Hughes*, 401 F.3d 540, 2005 WL 628224, at *4 (4th Cir. Mar. 16, 2005) (stating that *Booker* indicates the remedial scheme should apply "to those defendants, like Fanfan, who had been sentenced under the mandatory regime without suffering a constitutional violation"); *United States v. Hamm*, 400 F.3d 336, 2005 WL 525232, at *3 (6th Cir. Mar. 8, 2005) (finding plain error although defendant's sentence was based upon facts admitted in his guilty plea "[g]iven that the Supreme Court has held that the Guidelines are now discretionary"); *United States v. Shelton*, 400 F.3d 1325, 2005 WL 435120, at *5 (11th Cir. Feb. 25, 2005) ("it was *Booker* error for the district court to sentence Shelton under a mandatory guidelines scheme, even in the absence of a Sixth Amendment enhancement violation"); *United States v. Williams*, 399 F.3d 450, 2005 WL 425212, at *2 (2d Cir. Feb. 23, 2005) (deciding that the Supreme Court implicitly ruled, by its remand of the sentence imposed on Fanfan, that a sentencing judge commits error by mandatorily imposing the Guidelines even though it was based only on facts found by the jury); *United States v. Antonakopoulos*, 399 F.3d 68, 2005 WL 407365 (1st Cir. Feb. 22,

(continued...)

Turning to the third prong of the plain error analysis, the Government argues that Mr. Rodriguez cannot prevail because he cannot show that the district court would have imposed a lighter sentence had it realized the advisory nature of the Guidelines. On this record, we simply cannot know what the district court would have done with the additional sentencing discretion now afforded by *Booker*. For that reason, we believe it appropriate, while retaining jurisdiction, to direct a limited remand in Mr. Rodriguez's case for proceedings consistent with our circuit's recent decision in *Paladino*, 401 F.3d 471, 2005 WL 435430, at *10. *See White*, slip op. at 13-15 (applying *Paladino*-limited remand due to mandatory application of the Guidelines and noting that, with regard to the fourth prong of plain error, "we can and have predetermined that if the defendant has been prejudiced by an illegal sentence, then allowing that illegal sentence to stand would constitute a miscarriage of justice." (citing *Paladino*, 401 F.3d 471, 2005 WL 435430, at *9; *United States v. Pawlinski*, 374 F.3d 536, 541 (7th Cir. 2004)). *But see United States v. Gonzalez-Huerta*, 403 F.3d 727, 2005 WL 807008, at *7-9 (10th Cir. Apr. 8, 2005) (en banc) (affirming sentence for failure to satisfy fourth prong of plain error because mandatory application of the Guidelines, absent constitutional error, was not a "particularly egregious" error "that would result in miscarriage of justice or otherwise call the judiciary into disrepute").

## 2. Mr. Castillo's Sentence

---

[8] (...continued)
2005) (determining that in light of *Booker* the first two plain error requirements—an error exists and that error is clear at the time of appeal—are satisfied whenever district court has treated the Guidelines as mandatory at the time of sentencing).

Mr. Castillo was tried and convicted by a jury on various federal drug trafficking charges. The jury's verdict included a finding that Counts I, II and III together involved more than 100 grams of a substance containing cocaine base, which required a base offense level of 32. *See* U.S.S.G. § 2D1.1(c)(4). The district court, however, attributed 238.4 grams of cocaine base and 18 grams of powder cocaine to Mr. Castillo's offenses, which increased the base offense level to 34. *See* U.S.S.G. § 2D1.1(c)(3). The enhanced offense level, combined with Mr. Castillo's criminal history category of IV, yielded a sentencing range of 210 to 262 months. The district court sentenced Mr. Castillo to serve concurrent sentences of 210 months' for Counts I, II, III and V, and a consecutive sentence of 120 months for Count VI. In announcing that sentence, the district court stated: "I'm going to accept the recommendation of defense counsel to sentence Mr. Castillo to the lowest end of the guideline range, which is a substantial amount of time." Sent. Tr. at 41.

The Government concedes, and we have no doubt, that under the holding in *Booker*, the district court's decision to increase Mr. Castillo's sentence absent jury fact-finding, in a mandatory Guidelines system, was error and that the error is obvious. *Paladino*, 401 F.3d 471, 2005 WL 435430, at *7. The Government argues, however, that Mr. Castillo has failed to establish plain error because he cannot prove that the district court would have imposed a lesser sentence had it understood the Guidelines to be advisory. Mr. Castillo contends that the district court's statement that the lowest end of the Guidelines range is "a substantial amount of time" demonstrates that, with more freedom, the district court would impose a lighter sentence.

On this record, we cannot be certain of what the district court would have done with the additional sentencing discretion now afforded by *Booker*. For that reason, we believe it appropriate, while retaining jurisdiction, to direct a limited

remand in Mr. Castillo's case for proceedings consistent with our circuit's recent decision in *Paladino*, 401 F.3d 471, 2005 WL 435430, at *10.

### 3. Restitution Order

As a final matter, for the sake of clarity, we note, as we did in the first part of our opinion, that a remand is appropriate as to both Mr. Rodriguez and Mr. Castillo to clarify that the $3,000 "buy money" ordered to be repaid as part of their respective sentences is appropriately considered a condition of supervised release. *See, e.g., United States v. Daddato*, 996 F.2d 903, 905 (7th Cir. 1993).

### Conclusion

For the foregoing reasons, we affirm Mr. Castillo's conviction. We reverse the restitution orders and remand to the district court to clarify that repayment of the $3,000 "buy money" is a condition of supervised release. While retaining jurisdiction, we remand this matter to the district court for proceedings consistent with *Paladino*, 401 F.3d 471, 2005 WL 435430, at *10.

IT IS SO ORDERED

EASTERBROOK, *Circuit Judge*, dissenting from the decision not to hear these appeals rehearing en banc. These cases pose one of the transition problems in implementing *United States*

*v. Booker*, 125 S. Ct. 738 (2005). What happens when there has not been a violation of the sixth amendment—because, for example, the only consideration that raised the sentence is a prior conviction, see *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), or the defendant has waived his right to submit any dispute to the jury, see *Shepard v. United States*, 125 S. Ct. 1254, 1263 n.5 (2005); *Blakely v. Washington*, 124 S. Ct. 2531, 2541 (2004)—but the district judge treated the Guidelines as conclusive? *Booker* knocks out 18 U.S.C. §3553(b)(1), which makes the system mandatory, for all prosecutions, not just those in which there is a constitutional problem. See 125 S. Ct. at 768-69. This holding applies to all cases on direct appeal. The opinions in *Castillo* and *White* put these propositions together and hold that cases in which there is no sixth amendment problem (and no misapplication of the Guidelines either) should be treated just like those in which the Constitution has been violated.

Yet one element of plain-error analysis is whether the shortcoming seriously impairs the fairness, integrity, or public reputation of judicial proceedings. *United States v. Olano*, 507 U.S. 725, 734-37 (1993); *Johnson v. United States*, 520 U.S. 461, 468-69 (1997); *Jones v. United States*, 527 U.S. 373, 394-95 (1999); *United States v. Vonn*, 535 U.S. 55, 62-63 (2002); *United States v. Cotton*, 535 U.S. 625, 631-33 (2002); *United States v. Dominguez Benitez*, 124 S. Ct. 2333, 2339-40 (2004). This condition is not satisfied when the district judge complied with all requirements of the Constitution, statutes, and rules. See *United States v. Gonzalez-Huerta*, 2005 U.S. App. Lexis 5705 *21-32 (10th Cir. Apr. 8, 2005) (en banc).

*United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005), says that a sentence lengthened because of a constitutional violation meets the plain-error standard; more time in prison, caused by a constitutional wrong, is unjust. One cannot say the same when there has been no violation of the

Constitution (or, indeed, of any other legal norm). The Sentencing Guidelines are not themselves an engine of wrong. They emphasize candor and consistency in sentencing and have been applied about a million times since 1987. *Schriro v. Summerlin*, 124 S. Ct. 2519 (2004), holds that sentences imposed in violation of another rule derived from *Apprendi v. New Jersey*, 530 U.S. 466 (2000), are not so likely to be unjust that the new rule must apply retroactively on collateral review, and we held in *McReynolds v. United States*, 397 F.3d 479 (7th Cir. 2005), that *Booker* likewise does not govern on collateral review. If this is so when the sixth amendment has been violated, what can be the source of injustice when it has been obeyed?

Although the plain-error standard differs from the standard for retroactive application, whether an error gravely undermines the reliability of the outcome is common to the two inquiries. Given *Schriro* and opinions such as *Edwards v. United States*, 523 U.S. 511 (1998), and *United States v. Watts*, 519 U.S. 148 (1997), it would be unsound to assert that applying the Guidelines is so problematic that relief is apt under the plain-error standard. When every statute has been enforced accurately and constitutionally, the fairness, integrity, and public reputation of judicial proceedings are unimpaired.

The disposition of *United States v. Fanfan*, which was consolidated with *Booker*, does not bear on this issue. The remedial majority's penultimate paragraph says, in part:

> In respondent Fanfan's case, the District Court held *Blakely* applicable to the Guidelines. It then imposed a sentence that was authorized by the jury's verdict—a sentence lower than the sentence authorized by the Guidelines as written. Thus, Fanfan's sentence does not violate the Sixth Amendment.

> Nonetheless, the Government (and the defendant should he so choose) may seek resentencing under the system set forth in today's opinions.

125 S. Ct. at 769. This does not mean that applying the Guidelines is wrongful even when the judge does not resolve any factual dispute. Quite the contrary. The reason that Fanfan's sentence did not violate the sixth amendment was precisely that it *did* violate the Sentencing Reform Act of 1984 and the Sentencing Guidelines. The jury found that Fanfan had distributed 500 or more grams of cocaine. How much more? The judge concluded (on a preponderance of the evidence) that Fanfan was culpable for 2.5 kilograms of powder cocaine plus 262 grams of crack. The top of the Guideline range for 500 grams was 78 months; the range for Fanfan's relevant conduct (including his role as a leader of a criminal organization) was 188 to 235 months. To avoid any constitutional problem, the judge sentenced Fanfan to 78 months' imprisonment. The United States appealed to the first circuit and filed a petition for certiorari before judgment, which the Court granted. So the case was before the Court on the prosecutor's complaint, not Fanfan's; the remand occurred because the sentence was too low, not because it might have been too high; plain-error review played no role in the decision.

Applying *Paladino* to no-constitutional-error situations is inconsistent with the reason the remedial opinion in *Booker* made the Guidelines advisory across the board. The alternative was asymmetric: defendants would have been free to argue for less time in every case, but when the top of the Guideline range was favorable defendants could have waived their sixth amendment rights and preserved that benefit. The Court stated that Congress would have been unlikely to adopt a one-sided approach. 125 S. Ct. at 768. Yet the approach taken in *Castillo* and *White* implements only

the defendant-favoring portion of the Court's remedy. No defendant is placed at risk of a higher sentence by a limited *Paladino* remand. (It would be anachronistic to reply that the prosecutor, too, could have appealed. Recall that this is plain-error review, which is to say that *neither* side noticed this issue until after the time for filing a notice of appeal had expired. Until *Booker* a prosecutor would have had no reason—and no statutory authority—to appeal from a sentence that fell within a properly calculated Guideline range. See 18 U.S.C. §3742(b).) That both sides have enjoyed the even-handed application of a symmetric Guidelines system is still another reason to say that no injustice has occurred.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*