# United States Court of Appeals
## For the First Circuit

---

No. 01-2318

UNITED STATES OF AMERICA,

Appellee,

v.

RAUL LUCIANO,

Defendant, Appellant.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, Chief U.S. District Judge]

---

Before

Lynch, Circuit Judge,
Farris, Senior Circuit Judge,[*]
and Lipez, Circuit Judge.

---

Randy Olen, with whom John M. Cicilline was on brief, for appellant.

Donald C. Lockhart, Assistant United States Attorney, with whom Margaret E. Curran, United States Attorney, and Zechariah Chafee, Assistant United States Attorney, were on brief for appellee.

---

May 6, 2003

---

[*] Of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

**LIPEZ, Circuit Judge.** Immediately after a buy-and-bust sting, government agents conducted a warrantless search of defendant-appellant Raul Luciano's "stash house" and found a sizable quantity of heroin, drug paraphernalia, and two 9mm handguns. Later, a two-count indictment issued, charging Luciano with possession with intent to distribute over 100 grams of heroin, see 21 U.S.C. § 841(a)(1), (b)(1)(B), and possession of a firearm in furtherance of a drug trafficking crime, see 18 U.S.C. § 924(c)(1)(A).

Before the case went to trial, Luciano unsuccessfully moved to suppress the evidence discovered during the search. The trial itself lasted less than two days. After barely two hours of deliberations, the jury returned a verdict of guilty on both counts. The court sentenced Luciano to sixty-three months' imprisonment on the drug possession count and sixty months' imprisonment on the gun possession count, the terms to be served consecutively as required by the gun possession statute. See id. § 924(c)(1)(D)(ii).

On appeal, Luciano presents two claims. First, he argues that the evidence was insufficient to support a finding that he had possessed a firearm "in furtherance of" a drug trafficking crime. Second, he claims that government agents failed to obtain his voluntary consent before conducting a warrantless search, and that the district court therefore erred in denying his motion to

-2-

suppress the drugs and firearms evidence. Rejecting both of Luciano's claims, we affirm.

## I.

Most of the underlying facts in this case are not in dispute.[1] On February 20, 2001, agents from the Drug Enforcement Administration ("DEA") convinced a female cooperating individual ("CI") to contact Luciano and schedule a drug purchase in Providence, Rhode Island. The CI met Luciano on Wayland Avenue in Providence, and they drove in separate cars to a three-story tenement building located at 31 Grape Street. Unbeknownst to Luciano, DEA agents followed in unmarked vehicles.

While Luciano was in the apartment building, agents established positions around the premises. A few minutes later, Agent Philip Bernal saw Luciano walk down the driveway towards the CI, who was waiting in her car parked on the street. Luciano was carrying a small parcel. When Luciano opened the door to the CI's car, Bernal approached with his gun drawn, identified himself as law enforcement, and told Luciano to put his hands in the air. Luciano complied, stepping back from the car and dropping the parcel. Bernal placed Luciano in handcuffs as four or five

---

[1] The first morning of trial, before the jury was empaneled, defense counsel indicated in open court that his client would be willing to plead guilty to and accept responsibility for the drug possession count, but for the government's refusal to drop the gun possession charge (which would, in effect, double Luciano's sentence).

additional agents came to the scene. The parcel was later found to contain a total of 6.5 grams of 92% pure heroin, divided into 800 glassine packets, each packet containing an individual dose. Some of the packets were stamped with a "bad boy" figure.[2]

Immediately after Bernal arrested Luciano, Special Agent James McCormick asked Luciano where he had just been inside the building. Luciano replied, "[t]hird floor." Several agents were then dispatched to the third floor of the building to conduct a "protective sweep." Agent Roberto DaSilva approached Luciano and advised him of his Miranda rights — first in English, then in Spanish. Luciano indicated to DaSilva that he understood his rights. DaSilva then asked Luciano for permission to search the third-floor apartment. Luciano responded, "[g]o ahead."

Agents led Luciano up to the sparsely-furnished third-floor apartment where he was uncuffed and placed in a chair at the kitchen table. DaSilva, who is bilingual, once again informed Luciano of his Miranda rights in English and in Spanish. Luciano was then given a consent-to-search form which provided in English:

> 1.      I have been asked to permit special agents of the Drug Enforcement Administration to search . . . 31 Grape Street, Apt #3 (3rd floor), Providence, RI;
> 2.      I have not been threatened nor forced in any way;

---

[2] At trial, Agent Bernal described the "bad boy" figure as "an individual with a crew cut . . . giving the finger." The stamp is used to identify the heroin as a particular "brand."

3.    I freely consent to this search.
The address had been written in by hand on the pre-printed form by Special Agent John O'Donoghue.  O'Donoghue asked Luciano if he understood English, and Luciano responded in the affirmative. O'Donoghue then read the consent form to Luciano and asked Luciano to read it.  Luciano, after reading the form, volunteered that he understood it.  O'Donoghue then asked Luciano again, "are you sure you understand?"  Luciano again answered in the affirmative and signed the form, which O'Donoghue and another agent signed as witnesses.

During the subsequent search, agent Bernal noticed a square panel in the ceiling that appeared to give access to an attic or crawl-space.  Bernal mounted a chair and pushed the panel aside.  Looking into the crawl-space, Bernal noticed a large black plastic bag near the edge, which he could reach without actually climbing into the opening.  Bernal took the bag down and inspected the contents.  Inside the black bag was another bag containing 371.6 grams of heroin — potentially over 40,000 individual doses. It also contained a digital scale with heroin residue on it, two coffee grinders with heroin residue on them, a sifter and spoon with residue, and ten boxes of glassine packets identical to those found in the parcel that Luciano had dropped on the ground outside

the building.[3]  Like those in the parcel, some of the packets were stamped with a "bad boy" figure.  At trial, Bernal, O'Donoghue, and DaSilva all testified that when the bag was brought into the kitchen, Luciano stated, "you got me" (or words to that effect), and admitted that the bag belonged to him.

Agent O'Donoghue then returned to the opening in the ceiling and climbed into the crawl-space.  Using his flashlight, he discovered a smaller bag, at least eighteen inches from the edge of the opening.  That bag contained two 9mm handguns and two loaded (but detached) magazines.  Subsequent tests demonstrated that the magazines fit the guns and that the guns worked.

Luciano was then removed to DEA headquarters where he was questioned again by Agent DaSilva.  The interrogation was audiotaped and ultimately entered into evidence at trial.  At the beginning of the interrogation, DaSilva advised Luciano of his Miranda rights a third time in English and Spanish, and Luciano indicated that he understood those rights.  DaSilva and Special Agent Anthony Cardello then interviewed Luciano in English. Luciano again admitted that the drugs and the drug paraphernalia in the crawl-space belonged to him.  While initially equivocating, he ultimately admitted that the guns were his as well:

_____

[3] At trial, Agent Bernal testified that these sundry items are used by heroin dealers to process heroin from the rock-hard substance imported from overseas into the powder form that is sold on the street.

```
DaSilva:    That stuff that we found in your
            apartment, that was yours?
Luciano:    Yeah.

[. . . .]

DaSilva:    OK, so the stuff is yours, how
            about the guns?  Are . . . are
            they yours too?
Luciano:    I don't know.
Cardello:   What do you mean you don't know?
Luciano:    The stuff is mine.
DaSilva:    The stuff was yours, ah, how much,
            how much heroin was there?
Luciano:    I don't know.
DaSilva:    What would you guess?
Luciano:    Two to three hundred . . .
DaSilva:    Two to three hundred grams?
Luciano:    Yeah.
DaSilva:    How about the, ah, all the
            packaging materials and all that,
            was that all yours also?
Luciano:    Yeah.

[. . . .]
```

After some overlapping voices and unintelligible conversation, the questioning returned to the guns:

```
Cardello:   The guns and the heroin?
Luciano:    Everything is mine and that's it.
```

Luciano then requested a lawyer, and the agents immediately stopped their questioning.

## II.

Luciano claims that the government presented insufficient evidence at trial to sustain a conviction for the second count —

the gun possession charge.[4]   See 18 U.S.C. § 924(c)(1)(A).[5]
Specifically, Luciano argues that the guns found in the crawl-space
"played no role whatsoever in the drug transaction; no 'nexus'
existed between the firearms and the drug selling operation."
Thus, he maintains, his possession of the firearms was not, as the
statute requires, "in furtherance of" his drug trafficking.
Therefore, the argument goes, his conviction under § 924 must be
reversed.

Before considering the merits of Luciano's claim, we note
that Luciano did not make this argument to the district court.  In
fact, he never made a Rule 29 motion for judgment of acquittal —
not at the close of the government's case, not at the close of his
own case, and not after the jury had returned its verdict.  We have
consistently held that claims of insufficient evidence must be
presented in the first instance to the district court.  See United
States v. Van Horn, 277 F.3d 48, 54 (1st Cir. 2002).  Since Luciano

---

[4] Luciano does not challenge on appeal his conviction for the
first count of the indictment — the drug possession charge.

[5] Section 924 provides in pertinent part:

[A]ny person who, during and in relation to any crime of
violence or drug trafficking crime . . . uses or carries
a firearm, or who, in furtherance of any such crime,
possesses a firearm, shall, in addition to the punishment
provided for such crime of violence or drug trafficking
crime . . . be sentenced to a term of imprisonment of not
less than 5 years . . . .

18 U.S.C. § 924(c)(1)(A) (emphasis added).

failed to make his insufficiency argument below, he "must . . . demonstrate 'clear and gross' injustice, or 'manifest injustice' before the conviction is overturned on that ground." United States v. Kilcullen, 546 F.2d 435, 441 (1st Cir. 1976) (quoting Malatkofski v. United States, 179 F.2d 905, 910 (1st Cir. 1950), and United States v. Principe, 482 F.2d 60, 61 n.1 (1st Cir. 1973)); see United States v. Serafino, 281 F.3d 327, 333 (1st Cir. 2002) (indicating that appellant must demonstrate "clear and gross injustice" to succeed on unpreserved insufficiency claim); Van Horn, 277 F.3d at 54 (same); United States v. Santiago, 83 F.3d 20, 23 (1st Cir. 1996) (same); United States v. Concemi, 957 F.2d 942, 950 (1st Cir. 1992) (same); United States v. Jiminez-Perez, 869 F.2d 9, 11 (1st Cir. 1989) (same); United States v. Greenleaf, 692 F.2d 182, 185 (1st Cir. 1982) (same).[6]

The "in furtherance of" language that Luciano puts at issue on appeal is a relatively recent addition to § 924. Congress added the phrase following the Supreme Court's decision in Bailey

---

[6] While our review for "clear and gross injustice" may sound akin to plain error review's "miscarriage of justice" standard, see United States v. Olano, 507 U.S. 725, 736 (1993), we have generally avoided framing the review of unpreserved insufficiency claims in terms of "plain error," as the cases cited in the text attest. But see United States v. Pena-Lora, 225 F.3d 17, 26 (1st Cir. 2000) (using "clear and gross injustice" standard for reversal when reviewing unpreserved insufficiency claim for "plain error"). Other circuits characterize the review as one for plain error only. See, e.g., United States v. Morgan, 238 F.3d 1180, 1186 (9th Cir. 2001); United States v. Villasenor, 236 F.3d 220, 222 (5th Cir. 2000) (per curiam).

v. <u>United States</u>, 516 U.S. 137 (1995).  The prior version of the statute applied only where a defendant "during and in relation to any . . . drug trafficking crime . . . uses or carries a firearm." 18 U.S.C.A. § 924(c)(1) (West 1995).  <u>Bailey</u> held that this language required the government to produce "evidence sufficient to show an active employment of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense."  516 U.S. at 143.  Congress then amended the statute so that it would apply when a defendant merely "possesses" a firearm "in furtherance of" a drug trafficking crime.  <u>See</u> Act of Nov. 13, 1998, Pub. L. 105-386, § 1(a), 112 Stat. 3469 (amending 18 U.S.C. § 924);  <u>United States</u> v. <u>Timmons</u>, 283 F.3d 1246, 1252–53 (11th Cir. 2002) (describing legislative history).

We do not have to explore exhaustively the semantic contours of "in furtherance of" in order to resolve this appeal. However, we must address Luciano's contention that he was entitled to a judgment of acquittal on the gun possession charge because there was no nexus linking the firearms in the crawl-space to the attempted drug sale that took place in front of 31 Grape Street.

In his brief, Luciano focuses exclusively on his encounter with the CI outside the building.  He states:  "It is undisputed that the illegal transaction took place outside of the apartment which housed the firearms."  Since "[n]o part of the transaction took place within the apartment," he maintains, the

-10-

firearms that were subsequently found there were not possessed "in furtherance of" that transaction, as required by the statute.  See 18 U.S.C. § 924(c)(1)(A).

Luciano's argument suffers from a fatal misapprehension of the underlying "drug trafficking crime."  The drug trafficking crime underlying Luciano's § 924 conviction was Count I of the indictment — possession with intent to distribute more than 100 grams of heroin, 21 U.S.C. § 841(a)(1), (b)(1)(B).  See 18 U.S.C. § 924 (c)(2).[7]  As indicated above, Luciano does not challenge his conviction on Count I.  The parcel that Luciano brought from the house to the CI in the car, however, contained a mere 6.5 grams of heroin.  Thus, when the jury found Luciano guilty of possession with intent to distribute more than 100 grams of heroin (Count I), the jury inescapably found that Luciano possessed the drugs found in the crawl-space.  Hence the predicate drug trafficking crime for Luciano's § 924 conviction pertained to the heroin found in the

---

[7] Subparagraph (c)(2) provides:
For purposes of this subsection, the term "drug trafficking crime" means any felony punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or the Maritime Drug Law Enforcement Act (46 U.S.C. App. 1901 et seq.).

18 U.S.C. § 924 (c)(2).

-11-

parcel <u>and</u> the drugs found in the crawl-space — the same crawl-space where the firearms and loaded magazines were discovered.[8]

The government offered uncontradicted testimony that the heroin in the crawl-space had a retail street value of over $200,000, and that firearms are often used by drug dealers to protect drug stockpiles, to preempt encroachment into a dealer's "territory" by rival dealers, and for retaliation. Presented with this evidence, the jury found that Luciano had possessed a firearm in furtherance of a drug trafficking crime. Given the close proximity of the firearms and loaded magazines to the significant stockpile of heroin, we have no difficulty concluding that there was a sufficient nexus between the drug trafficking crime and the firearms to sustain a conviction under § 924. <u>See</u> <u>United States</u> v. <u>Ceballos-Torres</u>, 218 F.3d 409, 415 (5th Cir. 2000) ("Together, these factors reasonably support a finding that [the firearms] protected his drugs and money against robbery. Possession of the [firearms] was, therefore, in furtherance of drug trafficking.").[9]

---

[8] Indeed, Luciano admitted during his interrogation that the drugs, the drug paraphernalia, and the firearms in the crawl-space were his.

[9] Although we have applied the "clear and gross injustice" standard of review because of Luciano's failure to present his insufficiency claim below, we would come to the same conclusion if he had properly objected to the sufficiency of the evidence and we were applying the de novo standard of review. <u>See</u> <u>United States</u> v. <u>Frankhauser</u>, 80 F.3d 641, 650 (1st Cir. 1996) (in reviewing properly preserved insufficiency claim, "we examine the record in the light most favorable to the verdict, drawing all reasonable inferences and credibility determinations in its favor, in an

The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. A warrantless search of a residence violates this proscription unless the search comes within one of a "few specifically established and well-delineated exceptions." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). One such exception is a search undertaken with the consent of the homeowner. Id. Before the district court, Luciano moved to suppress the evidence discovered in the crawl-space as the fruit of an unlawful, nonconsensual search. The district court conducted a suppression hearing and heard testimony from four agents and from Luciano himself. At the end of the hearing, the court ruled from the bench that Luciano lacked credibility as a witness and that Luciano had consented to the search verbally and in writing. Moreover, the court found that Luciano sufficiently understood English to render his consent meaningful, and that his ability to consent was not impaired by alcohol intoxication.

"A district court's findings of fact on a motion to suppress are reviewable only for clear error as to consent." United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994). The

---

effort to ascertain whether the proof would allow a rational jury to find every essential element of the crime charged beyond a reasonable doubt").

judge has had the "opportunity to hear the testimony, observe the witnesses' demeanor, and evaluate the facts at first hand." Id. We will reverse only if we are "left with the definite and firm conviction that a mistake has been committed." United States v. Barnett, 989 F.2d 546, 556 (1st Cir. 1993) (citations omitted). "The question of whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances." Schneckloth, 412 U.S. at 227.

At the suppression hearing, Agent DaSilva testified that he had "Mirandized" Luciano twice — once outside 31 Grape Street, and once again in the third-floor apartment — both times in English and Spanish. At the hearing, DaSilva authenticated a copy of the standard-issue card from which he read the warnings. He also testified that Luciano had orally consented to a search of the apartment immediately after Da Silva had delivered his first set of Miranda warnings. Other agents testified that they had witnessed these exchanges between DaSilva and Luciano. Luciano, however, testified that none of the foregoing had taken place — no verbal Miranda warnings and no oral consent. The district court explicitly rejected Luciano's testimony as incredible, while crediting the testimony of the agents.

The district court was more than justified in rejecting the testimony of Luciano as "preposterous." The court observed

-14-

that Luciano offered patently incredible testimony regarding the parcel he delivered to the car — that he had found it under some grass in the backyard of the building.  Luciano made inconsistent representations concerning the amount of time he had spent in the United States.  He also claimed not to understand English, despite having spent twelve of his thirty years — including third through eighth grades — in the United States, despite the transcript from his interrogation in which he indicated that he understood English, and despite correcting the court interpreter as he translated during the suppression hearing.  Finally, Luciano's testimony was peppered with implausibilities and suspicious lapses in memory.

More damning is the written, signed consent form executed by Luciano himself and witnessed by two agents.  Luciano claims that he had failed to understand the substance of what he was signing.  Agent O'Donoghue testified, however, that he had read the form out loud to Luciano, that Luciano had read it himself, and that Luciano affirmatively indicated his understanding of it. Moreover, the form was in simple English.  As the preceding paragraph indicates, the district court was justified in concluding that Luciano possessed sufficient English language skills to understand that he was consenting to a search.

Luciano argues that, even if he understood that he was consenting, his consent was involuntary and therefore invalid.  See Bumper v. North Carolina, 391 U.S. 543, 548 (1968) ("When a

-15-

prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given."). He relies on three considerations. First, Luciano argues that his judgment was impaired by his intoxication. See United States v. Johnson, 563 F.2d 936, 939 (8th Cir. 1977) ("If the trial court had found that by reason of extreme intoxication the defendant's consent was not the product of a rational intellect and a free will, then the consent would not have been valid."). The district court explicitly found, however, that Luciano was not so intoxicated as to render his consent ineffective. The court noted that Luciano was sober enough to drive from Wayland Avenue to Grape Street to effectuate his drug sale. Moreover, several agents testified that Luciano did not appear drunk or behave as if he were so intoxicated that he could not understand the rights he was explicitly waiving.

Second, Luciano argues that the consent was coerced because agents had threatened his girlfriend. Luciano relies on United States v. Bolin, 514 F.2d 554 (7th Cir. 1975), in support of this argument. See id. at 560-61. ("In view of the fact that the defendant signed the consent form while undergoing custodial interrogation and only after he had been impliedly threatened that his girl friend would be arrested if he did not sign, we hold that the consent was involuntary and therefore invalid."); see also Bumper, 391 U.S. at 550 ("Where there is coercion there cannot be

-16-

consent."). At the suppression hearing, Luciano testified that he had signed the consent form because agents told him that "they were going to find my girlfriend and do something to her, and I was very scared." In its statement of reasons for denying the motion to suppress, the district court did not make an explicit finding regarding Luciano's claim of coercion or duress. However, given the district court's rejection of Luciano's testimony as "preposterous," the district court impliedly rejected any claim of coercion on the part of the government agents. The district court did not err in that finding.

Finally, Luciano argues that he was coerced into consenting because immediately after Agent Bernal handcuffed him — and before the government claims Luciano gave his consent — agents were dispatched to the third-floor apartment to conduct a search. Since the search was already well underway when he was asked for his consent, he claims he could not have reasonably known that he could still refuse the search. See United States v. Tovar-Rico, 61 F.3d 1529, 1536 (11th Cir. 1995) ("[Defendant] had already observed officers explore every room in the apartment and could not reasonably have known that she could still refuse a search.").

Luciano never made this argument to the district court in support of his motion to suppress. Therefore, we will not consider it for the first time on appeal. United States v. Santos Batista, 239 F.3d 16, 19 (1st Cir. 2001) ("Failure to raise suppression

-17-

arguments before trial shall constitute waiver thereof."); <u>United States</u> v. <u>Torres</u>, 162 F.3d 6, 11 (1st Cir. 1998) ("[W]hen a party fails to raise a theory at the district court level, that theory is generally regarded as forfeited and cannot be advanced on appeal."). This case underscores the importance of this rule. As the government persuasively argues, if Luciano had made this claim below, the government would have introduced evidence and arguments regarding the timing and nature of the search, whether exigent circumstances mandated a protective sweep, and (assuming that the search was improper) whether the discovered evidence was admissible under some other theory.[10]

"The voluntariness of a consent to search turns on an assessment of the totality of the circumstances." <u>Barnett</u>, 989 F.3d at 554-55. Having carefully considered all of Luciano's arguments regarding the facts and circumstances relating to the search, we conclude that the district court did not err in finding that Luciano had validly consented to the search of the third-floor apartment. The district court properly denied the motion to suppress.

---

[10] Since the record is undeveloped concerning the timing of the agents' entry, the nature of their initial presence in the apartment, and the scope of any protective sweep, Luciano cannot even avail himself of plain error review. <u>See</u> <u>Torres</u>, 162 F.3d at 11 n.2 ("[Plain error review] has no applicability where, as here, the defendant has failed to develop the necessary factual record undergirding a particular suppression claim.").

-18-

**AFFIRMED**.