In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-2979

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LONNIE D. MORRIS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 06 CR 50007—**James B. Zagel**, *Judge.*

ARGUED JUNE 2, 2009—DECIDED AUGUST 10, 2009

Before POSNER, RIPPLE, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* In 2007, a jury convicted Lonnie
Morris of drug and firearm offenses. On appeal, he chal-
lenges the sufficiency of the evidence, the jury instruc-
tions, and the admission of certain expert testimony.
We affirm his conviction.

## I. BACKGROUND

In late May 2005, authorities began investigating sus-
pected drug trafficking activities at 707 Albert Avenue, a

residence on the west side of Rockford, Illinois. The investigation was conducted by the Metro Narcotics Unit, a joint enterprise between the Rockford Police Department and the Winnebago County Sheriff's Department. Sergeant Marc Welsh supervised the MNU.

Between five and ten times from May 22 to June 2, Richard Gambini, a detective with the MNU, surveilled 707 Albert. The house was leased by Tamica Wilson, who lived there with her two children. On at least five occasions, Gambini observed the defendant, Lonnie Morris, on or near the premises. Morris was frequently seen coming and going in a maroon-colored 1995 Chrysler Cirrus.

Early in the morning on June 2, Gambini and a colleague searched trash bags that were left on the curb in front of 707 Albert. Inside, they found approximately three hundred plastic sandwich bags with the bottoms cut off; remnants of a package of Dormin, an over-the-counter sleeping pill commonly used to "cut," or dilute, heroin for sale; and a handful of documents sent to Lonnie Morris's attention at a different address.

Later that day, Gambini returned to 707 Albert with a search warrant for both the house and the Chrysler Cirrus. Gambini drove by the home and elected not to execute the warrant at that time because the Cirrus was not parked at the house.

Within minutes, Gambini found the Cirrus in a liquor store parking lot a short drive from 707 Albert. Morris was in the driver's seat, alone in the car. As Gambini watched, an individual approached Morris's car window,

where the two engaged in a short conversation and ex-changed unidentifiable items.

Following this first exchange, Morris drove the Cirrus out of the parking lot. Gambini followed. After driving for several blocks, Morris pulled the car to the curb near an intersection. The scene from the liquor store repeated itself. A different individual approached the car, spoke with Morris through the driver's window, and engaged in a hand-to-hand exchange with Morris. Again, Gambini was unable to identify the items that the men exchanged.

From there, Morris, with Gambini still on his tail, pro-ceeded to 707 Albert. Morris parked the Cirrus in the driveway but remained in the car. A short time later, a second car pulled into the driveway behind the Cirrus. The driver of the second car emerged and walked to the Cirrus, where he had a short discussion with Mor-ris. For a third time, Morris handed something to the individual through the driver's window, received some-thing in return, and the man departed. Morris then entered the house.

At that point, Gambini summoned his team to execute the warrant on 707 Albert. Within ten minutes, the MNU raid squad arrived and entered the premises through its back door. Gambini, who was the last one through the door, heard someone running up a set of stairs located to his right that led to the home's base-ment. He moved to the top of the stairs and observed Morris scaling the last few steps before running through the door and out of the house. An officer stationed outside tackled Morris.

In the basement of the house, officers found a washer and dryer, a cellular telephone, a razor blade, a digital scale, and two empty plastic sandwich bags. In addition to random debris, the basement contained a mattress leaned against a corner wall. Behind the mattress, the search team found a one-gallon plastic bag containing a chunky, brown, powdery substance that was later identified as 23.6 grams of heroin. Officers searched the entire residence but found no tangible evidence linking Morris to the house.

Police also discovered pertinent evidence inside the Chrysler Cirrus. In the door's handle well, Detective Gambini found a small plastic bag, inside of which were two smaller plastic bags. The two smaller plastic bags contained an off-white powdery substance, later identified as a total of 0.09 grams of a mixture containing heroin. Underneath the bag with the heroin, Gambini found another plastic bag, in which he recognized four pink Dormin tablets. Like many cars, the Cirrus had a storage compartment in the lower portion of the driver's door. In that compartment, Gambini observed a document and a Jennings .22-caliber handgun. Further inspection revealed that Morris's name was on the document.

The search proceeded to 707 Albert's detached garage. There, Gambini discovered two vehicles, one being a Lincoln Town Car. The Town Car's trunk was ajar, and inside Gambini found three plastic bags filled with a total of nearly $5,000 in cash. Subsequent analysis revealed Morris's fingerprints on one of the bags. Using

a distinctive red key chain found inside the house, Gambini opened the Town Car, where he found a document from the Department of Public Aid addressed to Lonnie Morris.

Following the search, Detective Gambini and a colleague, Detective Rossow, escorted Morris to jail. According to Gambini's testimony, Morris told the two detectives while in transit: "This case is dropped. You had no probable cause to get in my house."

Morris was subsequently released. Four days later, authorities pulled him over for driving without wearing a seat belt. Detective Gambini came to the traffic stop, where he observed and seized the same distinctive red key chain that he had used to open the Town Car during the search of 707 Albert.

In February 2006, a federal grand jury returned an indictment charging Morris with three offenses. Count One alleged that Morris knowingly and intentionally possessed, with intent to distribute, 23.7 grams of a substance containing heroin, thereby violating 21 U.S.C. § 841(a)(1). Count Two charged Morris, a convicted felon, with possessing a firearm. *See* 18 U.S.C. §§ 922(g)(1), 924(e)(1). Count Three averred that Morris had knowingly possessed a firearm in furtherance of the drug trafficking crime alleged in Count One, a violation of 18 U.S.C. § 924(c). Morris was arrested shortly thereafter.

A jury trial was held in January 2007. The government presented evidence of the preceding facts, as well as several expert witnesses, including Sergeant Welsh, who

testified to common practices observed in the area drug trade. The jury found Morris guilty of all three counts contained in the indictment. The court later sentenced Morris to a total of 300 months in prison. Morris now appeals the conviction.

## II. ANALYSIS

Morris presents three arguments on appeal. First, he contends that the evidence was insufficient to support his conviction. Specifically, he argues (1) that the government failed to prove that he constructively possessed either the drugs or the gun, and (2) that if he did possess the gun, the evidence did not support the jury's finding that such possession was "in furtherance of" a drug trafficking crime. Second, and relatedly, Morris asserts that the district court erred in refusing to give a proffered jury instruction defining the term "in furtherance of." Finally, Morris challenges the district court's decision to admit Sergeant Welsh's expert testimony concerning distributable quantities of heroin. Although we see some merit in these challenges, none are ultimately persuasive.

### A. Sufficiency of the Evidence

A defendant attacking the sufficiency of the evidence used to convict him "'faces a nearly insurmountable hurdle.'" *United States v. Pulido*, 69 F.3d 192, 205 (7th Cir. 1995) (quoting *United States v. Teague*, 956 F.2d 1427, 1433 (7th Cir. 1992)). To succeed, Morris must show that,

based on the evidence presented at trial, no rational juror could find guilt beyond a reasonable doubt. *United States v. Luster*, 480 F.3d 551, 555 (7th Cir. 2007); *United States v. Hach*, 162 F.3d 937, 942 (7th Cir. 1998) ("Only if the record is devoid of evidence from which a jury could find guilt will we reverse."). In conducting this analysis, we view the evidence in the light most favorable to the government. *United States v. Richardson*, 208 F.3d 626, 631 (7th Cir. 2000).

Morris's initial sufficiency of the evidence arguments relate to his possession of the drugs and firearm. His remaining challenge is that the evidence was insufficient to find that he possessed the firearm "in furtherance of" a drug trafficking crime.

### 1. Constructive Possession

All three counts on which the jury convicted Morris— possessing heroin with intent to distribute, *see* 21 U.S.C. § 841(a)(1); possessing a firearm in furtherance of a drug trafficking crime, *see* 18 U.S.C. § 924(c)(1)(A); and possessing a firearm as a convicted felon, *see id.* § 922(g)(1)— involve one common element: possession. Morris now challenges this element with respect to each of his three convictions.

For each of these offenses, possession can be either actual or constructive. *See United States v. Irby*, 558 F.3d 651, 654 (7th Cir. 2009) (applying § 841(a)(1)); *United States v. Castillo*, 406 F.3d 806, 812 (7th Cir. 2005) (applying § 924(c)(1)); *United States v. Caldwell*, 423 F.3d 754, 757-58

(7th Cir. 2005) (applying § 922(g)(1)). Constructive possession is a legal fiction whereby an individual is deemed to "possess" contraband items even when he does not *actually* have immediate, physical control of the objects, i.e., the individual "does not possess them in a literal sense." *United States v. Windom*, 19 F.3d 1190, 1200 (7th Cir. 1994); *see also United States v. Kitchen*, 57 F.3d 516, 524 n.2 (7th Cir. 1995) (defining "actual possession"). Because the government does not contend that Morris actually possessed either the drugs or the gun, we confine our discussion to constructive possession.

To determine constructive possession of both the drugs and the gun, we apply the same test. *See, e.g.*, *United States v. Kelly*, 519 F.3d 355, 361 (7th Cir. 2008). *Compare Irby*, 558 F.3d at 654 (requiring proof of "ownership, dominion, or control" to demonstrate constructive possession of drugs), *with Caldwell*, 423 F.3d at 758 (requiring that a person "ha[ve] the power . . . to exercise dominion and control" over a gun). In either case, the government must prove a nexus between the defendant and the relevant item to separate true possessors from mere bystanders. *Richardson*, 208 F.3d at 632. Proximity to the item, presence on the property where the item is located, or association with a person in actual possession of the item, without more, is not enough to support a finding of constructive possession. *Windom*, 19 F.3d at 1200 (citing *United States v. DiNovo*, 523 F.2d 197, 201 (7th Cir. 1975)). Instead, the defendant must exercise dominion and control over the item. *Irby*, 558 F.3d at 654; *Kelly*, 519 F.3d at 361. The government may prove constructive possession through direct as well as circumstantial evidence. *Kelly*, 519 F.3d at 361.

We turn first to the question of whether Morris constructively possessed the heroin found in the basement at 707 Albert. We then consider whether Morris constructively possessed the heroin and the pistol found in the door of the Chrysler Cirrus.

*a. Constructive Possession of the Heroin in 707 Albert's Basement*

Upon executing the search warrant at 707 Albert, authorities discovered 23.6 grams of heroin in the basement. Morris argues that the evidence was insufficient to prove the requisite nexus connecting him to these drugs. Such a nexus is typically shown in one of two ways. First, if the government demonstrates that the defendant had "exclusive control" over the property where the drugs were discovered, one may infer that the defendant constructively possessed the items, including drugs, found on that property. *Castillo*, 406 F.3d at 812. In this case, however, the government did not rest its arguments at trial on whether Morris possessed such control. Instead, the government focused on the second means of proving a nexus between Morris and the drugs in the basement: substantial connection.

In the absence of exclusive control, evidence that a defendant had a "substantial connection" to the location where contraband was seized is sufficient to establish the nexus between that person and the drugs. *See Richardson*, 208 F.3d at 632; *see also United States v. Brown*, 328 F.3d 352, 355 (7th Cir. 2003). As we will discuss, we have found a substantial connection in a variety of circum-

stances, and we conclude that such a connection existed here.

In *Richardson*, 208 F.3d 626, for example, we found the defendant to be substantially connected to a residence when he kept clothes and medicine at the house, received mail there, and "admitted that he was the caretaker and landlord of the address." *Id.* at 632. Similarly, in *Kitchen*, 57 F.3d 516, we held that the jury was right to find constructive possession when the defendant had received calls at the home where weapons were found, had stated that he lived at that address, and had been seen at the address on numerous occasions. *Id.* at 520. In addition, investigators located the defendant's clothing, jewelry, and mail at the residence. *Id.* Finally, the defendant had spent substantial amounts of money repairing the house. *Id.*

The facts of the instant case are not as straightforward as those in *Richardson* and *Kitchen*. During the search of 707 Albert, the police did not recover any tangible items linking Morris to the premises. They found no clothing, no personal items, and no mail sent to Morris at that address. Morris claims that the government's case was founded on mere proximity alone and that the absence of tangible evidence linking him to 707 Albert is determinative. In support, Morris relies principally on two cases, *Windom*, 19 F.3d 1190, and *United States v. Herrera*, 757 F.2d 144 (7th Cir. 1985).

In *Windom*, the government produced no evidence linking the defendant to drugs found in a backpack that was recovered from a house belonging to the defen-

dant's niece. 19 F.3d at 1201. The defendant was in the house when the backpack was discovered, but the court held that his presence alone was not enough to support the jury's conviction. *Id.* at 1200-01.

We reached the same conclusion in *Herrera*. There, the defendant was arrested after he left a house carrying a brown bag that contained heroin. 757 F.2d at 147. A search of the house he was leaving revealed a locked footlocker containing numerous packages of heroin, a gun, money, a scale, and plastic bags. *Id.* The district court convicted the defendant of possessing the heroin found in the footlocker. *Id.* at 148. On appeal, we overturned the conviction related to these drugs, concluding that the government had not shown that the defendant had the ability to exercise dominion and control over them. *Id.* at 150. The footlocker was locked, the defendant had no key, and the purity of the heroin seized on the defendant's person did not match the purity of the heroin found inside the locker. *Id.* The only evidence of the defendant's "possession" of the drugs in the footlocker was his presence on the property where it was located, and that was insufficient. *Id.*

We agree with Morris that his case bears some semblance to *Windom* and *Herrera*. There is a dearth of tangible evidence linking Morris to 707 Albert, and we recognize that much of the government's case at trial rested on Morris's proximity to the drugs in the basement. As we mentioned, however, the government may use circumstantial evidence to demonstrate the substantial connection sufficient to prove constructive possession.

*Kelly*, 519 F.3d at 361. And, although proximity alone is not enough to establish constructive possession, the requisite additional evidence, circumstantial though it may be, need not take the form of physical, tangible items that link an individual to a given location.

The D.C. Circuit, in words that we find persuasive, has said that "proximity coupled with evidence of some other factor—including connection with [an impermissible item], proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in an enterprise is enough to sustain a guilty verdict." *United States v. Richardson*, 161 F.3d 728, 732 (D.C. Cir. 1998) (quotations omitted); *see also United States v. Gibbs*, 904 F.2d 52, 57 (D.C. Cir. 1990). We find that there was ample evidence of these "other factors."

We begin with Morris's flight from the basement. We have previously identified a defendant's flight as the "something more" sufficient to overcome the mere presence doctrine. *See United States v. Starks*, 309 F.3d 1017, 1025 (7th Cir. 2002). In *Starks*, police raided a house and discovered the two defendants in a room with a table full of drugs. *Id.* at 1019. The men fled, hiding in a closet. *Id.* at 1020. The house itself was largely devoid of possessions, resulting in no tangible evidence to link the defendants to the house. *Id.* The defense argued on appeal that mere presence was insufficient to support a finding of possession by one of the defendants. *Id.* at 1022. In upholding the conviction, we identified the defendant's flight as one factor supporting the jury's verdict. *Id.* at 1025 ("From the very infancy of criminal

litigation, juries have been permitted to consider flight as evidence of consciousness of guilt and thus of guilt itself." (quotations omitted)). In the present case, the inference of guilt drawn from Morris's flight is only strengthened when the area from where he was fleeing contained nothing of any substance but the drugs and accompanying paraphernalia.[1]

Morris's flight was not the only circumstantial evidence of his "substantial connection" to 707 Albert. His own words provided more. Morris made two statements indicating a connection with the house. First, following his arrest, Morris told Detective Gambini: "This case is dropped. You had no probable cause to get in *my house*" (emphasis added). Next, according to a written statement provided by Donte Webb, one of Morris's cousins, Morris told Webb "that the police had raided one of [Morris's] houses." Such statements certainly give rise to the inference that Morris was substantially connected to 707 Albert. *See Starks*, 309 F.3d at 1024 (discussing that a "link" distinguishing mere presence from participation could include "the giving of incriminating statements"); *cf. Richardson*, 208 F.3d at 632 (denying a sufficiency-of-the-evidence challenge in part because

---

[1] As previously noted, the contents of the basement included a mattress leaned against one wall, behind which police located the bag of heroin; a washer and dryer; a cellular telephone; a razor blade; a digital scale; some small plastic bags; and debris. Only the washer and dryer would seem to have any legitimate purpose, and we doubt very much that Morris was doing laundry.

the defendant admitted to being the landlord of the property); *Richardson*, 161 F.3d at 732 (indicating that a statement intimating involvement would be enough to support a conviction); *Kitchen*, 57 F.3d at 520 (denying a sufficiency-of-the-evidence challenge in part because the defendant admitted to living at the address).

Other evidence supporting the jury's finding of the requisite connection between Morris and 707 Albert included the frequency of Morris's presence at the house during previous weeks, *see Kitchen*, 57 F.3d at 520 (noting that the defendant had been seen at the house "on numerous occasions"), and the Lincoln Town Car parked in the house's garage, which contained a document addressed to Morris and whose key Morris possessed during the traffic stop four days after the search. In addition, police recovered his fingerprint on the money bag that was found in the Town Car. Also, in a search of 707 Albert's garbage, police discovered mail to Morris, albeit not sent to that address.

In sum, although the evidence might not have been as persuasive as Morris's name on the lease, his clothes in the closet, or his letters in the mailbox, it provided sufficient circumstantial support for the jury's finding that Morris had a substantial connection to 707 Albert. This connection gave rise to the permissible inference that Morris constructively possessed the drugs contained in its basement. *See Starks*, 309 F.3d at 1021-22 ("[T]he trier of fact is entitled to employ common sense in making reasonable inferences from circumstantial evidence."). Thus, we reject Morris's challenge to the sufficiency of the

evidence related to the 23.6 grams of heroin found in 707 Albert, and we turn to the sufficiency of the evidence pertaining to the drugs and firearm found in the Chrysler Cirrus parked in the driveway.

    *b.    Constructive Possession of the Heroin and Firearm in the Cirrus*

The search warrant executed at 707 Albert also authorized the search of two vehicles, one of which was the Chrysler Cirrus that Morris drove to the house the day of the raid. From storage areas in the Cirrus's driver's-side door, police recovered two small bags of "an off-white powdery substance," later identified as 0.09 grams of a mixture containing heroin; a handgun; and a document with Morris's name on it. Again, because the government does not claim that Morris was ever seen handling either the drugs or the gun, Morris challenges the sufficiency of the evidence demonstrating that he constructively possessed the items found in the car. We find this to be a much simpler question than Morris's initial challenge concerning the drugs in 707 Albert's basement.

  Morris's arguments again rest on the mere presence doctrine. The car was registered in another person's name, and there was evidence that other people drove the vehicle during the days and weeks preceding the search on June 2. Morris's fingerprints were found on neither the firearm nor the bags containing the drugs. That, however, is where the evidence favorable to Morris ends.

Detective Gambini testified that he had seen Morris driving the Cirrus on multiple occasions during his surveillance of 707 Albert. On June 2, the day of the raid, Gambini observed Morris in the Cirrus near the house. As Gambini watched, Morris engaged in three separate exchanges with individuals approaching the car, the third of which occurred in 707 Albert's driveway. After the final exchange, Morris exited the car and entered 707 Albert, which authorities raided shortly thereafter. Gambini testified that no one else accessed the car in the interim.

This evidence is sufficient to sustain the jury's finding that Morris constructively possessed both the drugs and the firearm found in the Cirrus. Although Gambini did not see what Morris exchanged with his three visitors, it was reasonable for the jury to conclude, particularly given the drugs, the gun, and the document in Morris's name later found in the car, that Gambini witnessed three drug transactions. *See Brown*, 328 F.3d at 355 (noting that authorities "need not catch a defendant red-handed to satisfy the possession requirement"); *Starks*, 309 F.3d at 1021-22 (commenting that juries may use common sense to reach reasonable inferences from circumstantial evidence). That Morris was dealing drugs from the Cirrus and possessed the drugs and gun found in the car is certainly a reasonable inference jurors could draw from these facts.

This case bears notable similarity to *United States v. Garrett*, 903 F.2d 1105 (7th Cir. 1990), where we upheld a conviction on a firearms charge when police appre-

hended a man who was suspected of soliciting a prostitute. *Id.* at 1107, 1110. The man was arrested just before he entered a vehicle that contained both drugs and a gun; neither the car nor the gun was registered to the defendant. *Id.* at 1107-08. That the defendant had keys to the car, and that the gun and drugs were on the floor of the driver's side, were facts sufficient to support the conviction. *Id.* at 1110-12; *cf. United States v. Moralez*, 964 F.2d 677, 680 (7th Cir. 1992) (finding facts "even more incriminating than [those] in *Garrett*" when the defendant, who was apprehended driving a car containing nearly thirty pounds of marijuana, was "in complete control and possession of the vehicle").

Here, where Morris was seen driving the vehicle on multiple occasions in the days prior to the raid, where he was seen conducting probable drug transactions from the car on the day of the raid, and where he was the vehicle's last known driver, the evidence was sufficient to find that he constructively possessed the heroin and the firearm found in the storage compartments of the car's door. Given these circumstances, that the car was not registered in Morris's name, that other people occasionally had access to the vehicle, and that there were no fingerprints found on the drugs or the gun do nothing to change that conclusion.

2.   *Possessing a Firearm "in Furtherance of" a Drug Trafficking Crime*

Having concluded that Morris constructively possessed the firearm and the drugs, it is a small step, given the

facts, to link the two together and conclude that there was ample evidence to convict Morris of possessing that firearm *in furtherance of* a drug trafficking crime. *See* 18 U.S.C. § 924(c)(1)(A).

Morris argues that the evidence failed to establish a "*specific* nexus between the *particular* weapon and the *particular* drug crime at issue," quoting *Castillo*, 406 F.3d at 815. Such a nexus is certainly required, but we fail to see what additional evidence the government could have shown short of Morris having had the gun on his person—which, as we have made clear, is not necessary. *See id.* at 812 (noting that a § 924(c) violation can be shown through either actual or constructive possession).

To address Morris's claim, we first reiterate the "particular drug crime" that the jury found "furthered" by his possession of the firearm. It was described in Count One of the indictment, which alleged possession, with intent to distribute, 23.7 grams of heroin. This amount encompassed both the 23.6 grams of heroin authorities found in 707 Albert and the 0.09 grams of heroin recovered from the Cirrus.

Morris attempts to distinguish between the drugs found in the car and those found in the house. In his eyes, the small amount of heroin from the car was not enough to imply any intent to distribute, only to use. The gun, therefore, which the government could link only to that smaller quantity, was not furthering any drug trafficking activity whatsoever.

But Morris's argument misses the mark. It is true that 0.09 grams is well below the quantities that the govern-

ment's expert testified would generally be considered a distributable amount. But such testimony is meant only as a guideline; it is incontrovertible that *any amount* is "distributable" when, as here, there is circumstantial evidence that the quantity of drugs, no matter how small, was in fact intended for distribution. That is what the jury must have concluded in this case—a reasonable conclusion given that police had just observed Morris engage in three probable drug transactions and later found additional drugs, packaged for resale, in the car from which those transactions occurred.

Furthermore, as we just noted, the indictment, which charged Morris with the *total amount* of heroin discovered from both the house and the car, made no distinction between the two locations where the drugs were located. Implicit in the jury's guilty verdict on Count One was its finding that Morris possessed the quantity of heroin specified therein—which included the 0.09 grams from the car—for distribution, not personal use. *Cf. United States v. Luciano*, 329 F.3d 1, 6 (1st Cir. 2003) (concluding that a jury "inescapably found" that the defendant possessed heroin discovered *both* on his person and inside his house when the jury's findings as to quantity mathematically mandated such a conclusion); *Castillo*, 406 F.3d at 818 (discussing *Luciano*). Thus, the "particular drug crime" involved both the drugs from the car and the house, and the statute requires only that the firearm be linked to this crime, not that it be linked to all, or any particular subset of, the underlying drugs. *See* 18 U.S.C. § 924(c)(1)(A).

We turn, then, to the evidence tying the gun to that crime. It was substantial. To begin, the government's expert, Sergeant Marc Welsh, testified that firearms were commonly used by drug dealers for protection from both police and other dealers.[2] The evidence presented comported with Welsh's testimony. The gun, partially concealed by a document bearing Morris's name, was in the driver's door. Morris was the driver. Police watched Morris engage in three exchanges that the jury could reasonably have concluded were drug transactions, the last of which occurred in 707 Albert's driveway, where Morris parked and exited the car. Searches of the house where the car was parked and the car itself revealed 23.6 and 0.09 grams of heroin, respectively. It was entirely reasonable for the jury to conclude that Morris possessed the gun to protect either himself, his drugs, or his money while he trafficked the drugs in the car and the house.

Our case law, bolstered by cases from our sister circuits, leaves no room to question the jury's conclusion under such facts. *See United States v. Seymour*, 519 F.3d 700, 715 (7th Cir. 2008) (listing factors useful in analyzing the "in furtherance of" question, including the type of drug activity being conducted, the firearm's accessibility and proximity to the drugs, and the circumstances under which the firearm was found); *Castillo*, 406 F.3d at 815

---

[2] Sergeant Welsh served as both an investigator and a witness in this case. Below, we address the potential implications of Welsh's dual role. *See infra*, pt. II.C.

(giving as an example of the required nexus "that the specific weapon at issue . . . [was] available for the protection of the drug dealer or his drugs"); *United States v. Gaston*, 357 F.3d 77, 83 (D.C. Cir. 2004) (concluding that weapons were possessed "in furtherance of" when they were "strategically located" for quick and easy accessibility); *Luciano*, 329 F.3d at 3-4, 6 (upholding an "in furtherance of" conviction when the defendant was caught dealing drugs outside his apartment but firearms and additional drugs were found inside the apartment).

Having reached the end of Morris's arguments relating to the sufficiency of the evidence, we turn to his remaining claims, beginning with his challenge to the court's decision not to instruct the jury on the meaning of "in furtherance of."

### B. "In Furtherance Of" Instruction

During the instructions conference, Morris's counsel offered the following instruction pertaining to Count Two of the indictment, which charged Morris with possessing a firearm "in furtherance of" a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A):

> The phrase "in furtherance of" as used in these instructions means to advance or promote the commission of the underlying drug trafficking offense. The government must prove a specific nexus between the firearm and the crime charged.

After some discussion, and over defense counsel's objection, the court declined to give the instruction.

We review the district court's refusal to give a jury instruction for an abuse of discretion. *United States v. Muhammad*, 502 F.3d 646, 655 (7th Cir. 2007).

The problem with Morris's argument is that it rests on the faulty premise that "in furtherance of" requires definition. In *Castillo*, 406 F.3d 806, we noted that "an instructive line of cases holds that it is not error—plain or otherwise—to fail to give a definition of a statutory term or phrase that carries its natural meaning and that meaning is accessible to lay jurors." *Id.* at 821. Other cases have alluded to this same principle. *Cf. United States v. Santos*, 932 F.2d 244, 252 (3d Cir. 1991) (finding no plain error when the district court declined to define "preponderance of the evidence" because, in part, the phrase's legal meaning was consistent with its common meaning); *United States v. Sherwood*, 770 F.2d 650, 654 (7th Cir. 1985) (finding no plain error when the district court declined to define "willfully" because the ordinary meaning of the term likely did not confuse the jury).

In *Castillo*, we discussed "in furtherance of" at length, commenting on the phrase's "natural meaning," 406 F.3d at 814 ("furthering, advancing or helping forward" (quotations omitted)), and stating that it "means what it says," *id.* at 815; *see also id.* at 821 ("'[I]n furtherance of' *naturally and necessarily* connotes more than *mere* presence or innocent possession." (first emphasis added)). Thus, although the court was free to give an instruction defining "in furtherance of," we determined that it was not error to decline to do so. *Id.* at 821-22.

In an attempt to minimize *Castillo*'s weight, Morris notes, correctly, that the discussion regarding the plain meaning of "in furtherance of" was not the core holding of the case. Indeed, by our count, the phrase's plain meaning was one of three reasons we provided to support our conclusion that the district court did not plainly err in refusing to define "in furtherance of." *Id.* at 820-21. But that fact does nothing to detract from the import of our comments, which was that the phrase carries a readily understood meaning that jurors comprehend without additional definition.

Further, the facts of *Castillo* are closer to those now before us than Morris would have us believe. A second factor we found important in our "in furtherance of" discussion was the comments made by the attorneys during closing arguments. *Id.* There, the prosecutor said the following: "So how did that shotgun further a drug crime? That's the question. Did it further—simply did it help the drug crime? Did it aid a drug crime in some way? How did that shotgun help this defendant possess with intent to distribute narcotics?" *Id.* at 820.

Here, the prosecutor did not use words like "help" or "aid." But taken in context, his comments left little doubt about the meaning of "in furtherance of":

> [W]hat furthers the crime of drug trafficking. Protection of your product, protection of your proceeds, protection of your person. . . . It's important for drug dealers to protect themselves, first and foremost, and almost as importantly their product and their cash, and that's exactly what

happened here. The defendant had the gun in the driver's side door just below the drugs that he was selling, protecting that product, protecting his person, and he was using guns to protect the money that he was generating from the heroin sales.

We conclude that the district court did not err by refusing to include a jury instruction defining the phrase "in furtherance of," as used in 18 U.S.C. § 924(c)(1)(A). The words have a plain meaning that is easily understood by jurors, rendering any definitional instruction perhaps helpful but not necessary. This conclusion is bolstered by the prosecutor's comments during closing arguments, which, to the extent further illumination might have been desired, provided additional light.

## C. *Admission of Sergeant Welsh's Expert Testimony*

Morris's final argument is that the district court should not have admitted testimony by Sergeant Marc Welsh, who testified as an expert for the government. The government offered Welsh's testimony to explain common practices of street-level narcotics sales, including what quantities of drugs are generally possessed for purposes of distribution rather than individual consumption. Welsh testified that 23.7 grams of heroin "would be consistent with distribution quantity."

The rub, however, is that Welsh was also the supervisor of the MNU at the time the unit raided 707 Albert. Testimony by other members of the search team and by

Welsh himself on cross-examination made it clear that Welsh was personally involved in executing the warrant on the house. Morris claims that Welsh's dual role—as both investigator and expert witness—caused his testimony to run afoul of the Federal Rules of Evidence, particularly Rules 704(b) and 403. We disagree.

Government prosecutors often call expert witnesses to discuss common practices employed by drug dealers. *See United States v. Foster*, 939 F.2d 445, 451 & n.6 (7th Cir. 1991) (collecting cases and noting that our circuit "is quite familiar with the use during trial of expert testimony as to the methods used by drug dealers"); *see also United States v. Anderson*, 61 F.3d 1290, 1297 (7th Cir. 1995). We have upheld the practice in a number of contexts related to the narcotics trade. *See United States v. Upton*, 512 F.3d 394, 401 (7th Cir. 2008) (discussing various contexts); *see also, e.g.*, *United States v. Gonzalez*, 933 F.2d 417, 428-29 (7th Cir. 1991) (use of short phone calls to avoid detection); *United States v. Solis*, 923 F.2d 548, 551 (7th Cir. 1991) (use of beepers); *United States v. Rollins*, 862 F.2d 1282, 1292 (7th Cir. 1988) (use of narcotics code words).

For many drug crimes, the government bears the burden of proving that the defendant possessed a given state of mind—often, as here, the intent to distribute narcotics. *See* 21 U.S.C. § 841(a)(1). But it is usually difficult or impossible to provide direct evidence of a defendant's mental state. *Cf. Pavlick v. Mifflin*, 90 F.3d 205, 209 (7th Cir. 1996) ("Direct evidence of knowledge is difficult—sometimes impossible—to obtain; therefore the

Supreme Court has held that [a defendant's mental state] need not be proven by direct evidence."). Instead, an individual's intent is generally proven through circumstantial evidence, often in the form of expert testimony. *See, e.g.*, *United States v. Lipscomb*, 14 F.3d 1236, 1239-43 (7th Cir. 1994) (examining in depth the role of expert testimony by law enforcement officers as circumstantial evidence of an individual's intent); *Solis*, 923 F.2d at 551 (finding expert testimony helpful "to establish . . . intent through circumstantial evidence"); *cf. Pavlick*, 90 F.3d at 209 ("Whether a [defendant acted with a requisite mental state] is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." (quotations omitted)). As we have explained, experts "simply describe[] in general terms the common practices of those [hypothetical individuals] who clearly do possess the requisite intent, leaving unstated the inference that the defendant, having been caught engaging in more or less the same practices, also possessed the requisite intent." *Lipscomb*, 14 F.3d at 1239. The jury is then left to decide whether to make the logical connection from the expert's testimony to the case at hand.

In offering expert testimony as circumstantial evidence of a defendant's intent, however, courts must be wary that the expert witness not cross into the jury's realm or otherwise risk prejudicing the jury. *See* Fed. R. Evid. 704(b), 403. Morris contends Welsh's testimony did both.

Rule 704 governs opinions that witnesses offer on so-called "ultimate issues." The rule is divided into two

parts, a general rule and an exception. The general rule states that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a). The exception provides as follows:

> No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

*Id.* 704(b).[3]

Under the rule, the potential problem arises when experts stray from their analysis of detached facts and offer opinions regarding the defendant's *actual* mental state; such conclusions are meant to be the exclusive province of the jury. It must be clear from the expert's testimony that he "was merely identifying an inference that might be drawn from the circumstances surrounding the defendant's arrest, and was not purporting to express an opinion as to the defendant's actual mental state." *Lipscomb*, 14 F.3d at 1240 (quotations omitted).

---

[3] In *Lipscomb*, we questioned the applicability of Rule 704(b) to non-medical experts but ultimately acknowledged that the rule limits the expert testimony of law enforcement officials as well. 14 F.3d at 1242; *see also United States v. Mancillas*, 183 F.3d 682, 706 (7th Cir. 1999).

Rule 403, meanwhile, permits a court to exclude evidence "if its probative value is substantially out-weighed by the danger of unfair prejudice." Testimony runs the risk of being overly prejudicial when, as here, the expert witness was a law enforcement officer who was also involved in the investigation at issue. *See Upton*, 512 F.3d at 401; *Lipscomb*, 14 F.3d at 1242; *see also United States v. Alvarez*, 837 F.2d 1024, 1030 (11th Cir. 1988) (discussing the "serious risk of undue prejudice" that arises from a government agent testifying as an expert); *United States v. Brown*, 776 F.2d 397, 401 n.6 (2d Cir. 1985) (noting that the risk of prejudice is increased when the expert opinion "is given by the very officers who were in charge of the investigation" (quotations omitted)). The danger is "that the jury may attach undue weight to the officer's testimony, either by mistaking an expert opinion for what is really only an eyewitness observation, or by inferring that the officer's opinion about the criminal nature of the defendant's activity is based on knowledge of the defendant beyond the evidence at trial." *Lipscomb*, 14 F.3d at 1242 (quotations omitted).

We find that the content and context of Sergeant Welsh's testimony avoided the potential pitfalls contemplated by Rules 704 and 403. Perhaps most importantly, Welsh testified only as an expert. This is a marked difference from previous cases dealing with this issue, where the relevant witness took the stand as *both* a lay witness and an expert. *See, e.g., Upton*, 512 F.3d at 398; *United States v. Mansoori*, 304 F.3d 635, 653 (7th Cir. 2002); *Lipscomb*, 14 F.3d at 1238; *United States v. de Soto*, 885 F.2d 354, 360 (7th Cir. 1989).

Here, the government produced numerous members of the Metro Narcotics Unit who testified to the events of June 2, 2005, the day of the raid on 707 Albert. Sergeant Welsh was not one of them. Instead, Welsh's testimony focused exclusively on his expert opinions regarding the drug trade in Rockford and his analysis of the facts related to Morris's case, e.g., that 23.7 grams of heroin, possessed by anyone, "would be consistent with distribution quantity." Never once did Welsh refer to Lonnie Morris specifically or even allude to his impressions or recollections from the day of the search, nor did he express an opinion about Morris's actual state of mind. *See Mancillas*, 183 F.3d at 706 (concluding that a dual-role witness "based his opinion on his knowledge of the drug trade rather than on any alleged or conceived familiarity with the working of [the defendant's] mind"); *Lipscomb*, 14 F.3d at 1243.

This is not to say that the jury was unaware of Welsh's role in the Morris investigation. Several government witnesses referred to Sergeant Welsh during their testimony, and Welsh acknowledged on the stand that he was the supervisor of the MNU and had been involved in the search of 707 Albert. Notably, however, virtually all of Welsh's statements regarding his role in the investigation were not brought out by the government but rather were elicited by defense counsel on cross-examination.

The government's decision not to use Welsh as a fact witness was an important step in avoiding potential juror confusion or crossing the line into improper opinion.

*See Mansoori*, 304 F.3d at 654 (recognizing a reduced potential for prejudice where the government structures testimony "in such a way as to make clear when the witness is testifying to facts and when he is offering his opinion as an expert").

In addition, the district court gave a standard instruction to the jury, reminding it of the following:

> You should judge [expert] testimony in the same way that you judge the testimony of any other witness. The fact that such a person has given an opinion does not mean you're required to accept it. Give the testimony whatever weight you think it deserves considering the reasons given for the opinion, the witness' qualifications, and all the other evidence in the case.

We have found the use of similar instructions to be another factor mitigating against jury confusion. *See, e.g.*, *id.* (finding it helpful when the jury was instructed that "the fact an expert has given an opinion does not mean that it is binding upon you or that you are obligated to accept the expert's opinion as to the facts").

Given these facts, we conclude that the district court did not admit Sergeant Welsh's testimony in violation of Rule 704(b) because it was made clear "in the nature of the examination[] that the opinion [was] based on the expert's knowledge of common criminal practices, and not on some special knowledge of the defendant's mental processes." *Lipscomb*, 14 F.3d at 1242. For the same reasons, Welsh's testimony was not unfairly prejudicial and did not violate Rule 403.

### III. CONCLUSION

First, there was sufficient evidence to sustain Morris's conviction on the three counts contained in the indictment. Second, the district court did not err by refusing to define the phrase "in furtherance of" in its instructions to the jury. Finally, the court properly admitted the expert testimony of Sergeant Welsh. We AFFIRM Morris's conviction.